MITCHELL v. BILDERBACK.

1. FRAUDS, STATUTE OF—SALE OF LAND—COMPROMISE AND SETTLE-
MENT—PAROL AGREEMENT.

An agreement not in writing between the owner of a farm to
which he held title by foreclosure subject to redemption,
and the person holding the equity of redemption, whereby
the parties stipulated to sell the premises and divide the
proceeds in proportion to their interests, is unenforceable as
to a sale made seven years later, being void under the statute
of frauds.

2. SAME—TRUSTS—PAROL AGREEMENT.

Under the invalid agreement no trust could be created in pro-
ceeds which were not then in existence.

3. TRUSTS—EQUITY—PAROL DECLARATION—INTENTION.

To create a trust by a parol declaration, where the donor re-
tains the property, it must be executed by acts and words of
a clear and unequivocal character, constituting something
more than a mere declaration of intention.

Error to Cass; North, J., presiding. Submitted June
10, 1909. (Docket No. 29.) Reargued January 10,
1910. Decided February 3, 1910.

Hattie Mitchell presented a claim against the estate of
Caiphas Dill, deceased, for an amount held in trust upon
the foreclosure of certain mortgages. The claim was dis-
allowed in the probate court, and claimant appealed to
the circuit court. A judgment for claimant is reviewed
by the administrator on writ of error. Reversed.

*Clyde W. Ketcham*, for appellant.

*Coy W. Hendryx*, for appellee.

HOOKER, J. The claimant filed a claim against the
estate of Dill, which was disallowed by the probate judge.
She appealed to the circuit court, where a jury rendered a

verdict allowing the claim in full, $1,575. The administrator has appealed.

Outline of Facts. Dill held two mortgages on a farm aggregating $3,500. Mrs. Mitchell held a later mortgage on the same premises for $1,500. Subsequently Dill took another mortgage for $1,000 on the same land. The land was subsequently sold at execution sale, at the instance of a creditor of the mortgagor. The plaintiff purchased this title, and after the expiration of the period of redemption took possession. She also foreclosed her mortgage and bid in the premises; the deed becoming operative by the expiration of the period of redemption on March 19, 1898, subject to Dill's first two mortgages. Dill foreclosed these two mortgages, and bid in the land, and the foreclosure deeds issued thereon became operative on April 3, 1898. The claim of the plaintiff is based on an alleged oral agreement, made between Dill and herself a short time before the expiration of the period of redemption from his sale and purchase.

The evidence of this transaction consists of the oral testimony of plaintiff's brother-in-law, Mr. Caster, who testified that he was present and heard the conversation; that plaintiff's interest in the land would soon have been cut off by the foreclosure title of Dill; that plaintiff and he went to see Dill about it, and she said to him that of course she could redeem from his mortgages, but it was an obligation she did not like to assume, to stand on her rights to redeem, and he replied:

" ' I don't really want the farm, for I am an old man, and we have a large farm now, to look after, and we really don't want it.' That was the argument of both of them, and they stood there for several visits we made, but finally we made a visit there when there was an agreement entered into that was proposed by old Mrs. Dill herself. *  *  *

" As I said, old Mrs. Dill spoke, after hearing the reasons why they didn't want to take the farm, she said, ' Why don't you sell the farm and divide the money, inasmuch as you don't either one of you want it?' She said

she could see why Mrs. Middleton didn't want the farm,
'and I know Mr. Dill doesn't.' She says, 'Why not sell
the farm and divide the money, if you don't either of you
want to stand on your rights?' And that seemed to be a
new proposition. They hadn't thought of it, and finally
Mr. Dill says—he says, 'I don't know why that won't be
a fair way to sell the farm.' He says, 'We know what we
have each got in there.' He says, 'I have figured the in-
terest on all the papers, all the interest,' and he says, 'It
amounts to a one-quarter interest.' He says, 'You take
the amount of money we have got in, and we will say
nothing about figuring interest.' He says, 'You know
what I paid Mr. Schimerhorn?' I says, 'I know what
Mr. Schimerhorn said to me.' He says, 'That is what I
gave, the face of the mortgages.'

"*Q.* How much?

"*A.* $3,500. He says, 'That is what I paid Mr.
Schimerhorn.' He says: 'Of course on the mortgage I
let him have $1,000; I had $4,500 in the farm, actual
money that I have paid in the farm, $4,500,' and he says,
'You have fifteen hundred that you let him have on the
third mortgage?' and he says, 'It is just three to one,'
and she says, Mrs. Middleton, 'I have sixteen hundred in
there.'

"*Q.* What was given to make up the sixteen hundred?

"*A.* Well, the execution; she says, 'I paid the execu-
tion to get possession of the farm.' He says, 'That is all
right,' but he says, 'Did you figure this when you bought
that that would give you possession of the farm, and you
would get the execution money back?'

"*Q.* How much was the execution?

"*A.* $105, I think, if I remember right; $105, I think
was the amount, but they figured it sixteen hundred.
'But,' he says, 'I figured we wouldn't count that; you
will get that back just as you figured, and that leaves
you fifteen hundred in and me forty-five, and you have
got a year for this farm, and have it rented'—she had
rented to one Mr. Anderson—and he says, 'During the
year you have a right to sell it, and go on and sell.' He
says, 'If you can sell the farm so that we will get our
money'—they both said if they got their money out they
would be satisfied. He says: 'During the year, if you
can sell it so to get our money out of it, sell it. If you
can get any money, we will divide in that ratio, if you
get more than $6,000, but,' he says, 'if you don't sell, and

I don't think you will sell it.' He says: 'The seasons have been bad, and the farm has been run, and it doesn't look good; I doubt whether you will sell it during the year, but if you get a chance, you sell it; we will both waive our rights, and next year,' he says, 'of course, I will go in possession of the farm. If you don't sell, I will sell it, but one thing I would like to provide about, the farm was run down, and I would like to see the farm fixed up,' and he says, 'We will if I do come in possession of the farm, and put the proceeds back on the farm until we fix it up a little and clean it up, and it is got a little better.' He says, 'This farm ought to bring a good price, $50 an acre.'

"*Q.* How many acres of it?

"*A.* 160 acres, and then he spoke, he says, 'It has been sold once I know of for $7,200, and,' he says, 'And no reason to me why, if this farm is fixed up it hadn't ought to bring $50 an acre, and if it does, it will let us both out,' and asked her what she thought of that, and she said to him, she hadn't thought of a proposition of that kind at all, and: 'I would like to think the matter over a little. I will let you know right away.' And this was in the middle of the week, and she said to him, she says: 'I will think the matter over, and we will drive over Sunday; I am anxious to get back my money, whether I stand on my rights, or whether I accept this proposition'—and he says, 'All right, take your time,' and then he spoke to me about it. He says, 'What do you think of that proposition, of that kind?' and I said, 'It seems to me that is fair enough if you want to dispose of the farm that way. That looks fair enough only,' I says, 'She has only—her time is limited to sell it in, a year, and your time seems to be unlimited. You say when you sell it you will divide?' And I said, 'Then it might be a fairly good proposition to you; you don't care to pay her anything until you do sell it,' and he says, 'That is a little one-sided,' and he says, 'Any time you feel I am not trying to sell it, you come over there and we will place it in some disinterested party's hands, and make the statement to him authorizing him to sell it,' and that seemed to be agreeable, and she says she would let him know Sunday, and he says: 'You needn't do that; it means a livery rig and take you out of the store.' And he says: 'I come to town every Saturday anyway, and I will call at your house, have to drive right by, and I will stop and get your decision Saturday

afternoon, and make up your mind what you want to do about it.' When I went down at supper time that Saturday I remember his rig stood in front of the house, and when I got there, he came out of the house.

"*Q*. Did you have a talk with him there?

"*A*. Yes; he passed the time of day there, and said to me then, ' Well,' he says, ' I guess it is you and I for it; we settled that deal all right.' I says, ' I am glad of it.' I says, ' How have you settled it now?' He says: ' Just as I went over it; she is to sell it if she can, and if not, I am to sell it. I have got a farm of my own in Silver Creek, and decided to remain there permanently. That she was going back to Springport.' He said anything that came up, as a matter of opinion in reference to the farm, he could come and see me about it, and it would be the same as though she was there, and he says, ' We have decided just as we talked over there, that we are to sell the farm and divide the money.'

"*Q*. If you found a purchaser during the time she held the record title, she was to make transfer?

"*A*. Yes, sir.

"*Q*. And if after he acquired the record title, he was to sell and transfer and make the division?

"*A*. Yes, sir.

"*Q*. And the matter was determined in that way, at that time?

"*A*. Yes, sir.

"*Q*. Now, this $1,000 mortgage that he held — the $1,000 that he let Mr. Cullinane have on the fourth mortgage, was subsequent or after Mrs. Middleton's mortgage?

"*A*. Yes, sir.

"*Q*. And in this arrangement, do I understand that was to come in and share in the proceeds, too?

"*A*. Yes, he figured the amount he paid Cullinane on that mortgage.

"*Q*. Forty-five hundred?

"*A*. Yes, sir; that included the interest he had in the farm; figured in that way.

"*Q*. Now, during this talk there at the house, was there any talk about her having arranged for the money to redeem his mortgages?

"*Mr. Ketcham:* I object to that; immaterial and irrelevant whether she arranged for the money or not.

"*Q*. And did they have conversation in reference to it?

"*Mr. Ketcham:* I object to that; irrelevant and immaterial whether she had talk with anybody about borrowing money.

"*The Court:* Well, if it is part of the same conversation, possibly it bears upon the proposition.

"*Mr. Hendryx:* It is part of the consideration, and she waives her right to redeem.

"*Mr. Ketcham:* Note an exception.

"*The Court:* You may take the answer. (Last question read.)

"*A.* She told Mr. Dill that she had arranged for money for him; that she could take up his mortgage at 6 per cent., and Mr. Dill says parties told her that they viewed the land, and if the security was good, she could have the money. He said to her, 'You needn't bother to go to any trouble to do that. If you conclude to stand on your rights, you can have the money; you can have it at 6 per cent. interest.'"

This talk appears to have been in the winter or spring of 1898. The same witness testified to a conversation with Dill in December, 1905, as follows, on the occasion of his calling to pay his taxes on other property:

"I called his attention to the 160 acres I assessed to him, the Cullinane farm, and he says: 'Yes, that is one thing I wanted to talk to you about, but,' he says, 'you are pretty busy.' He says, 'I suppose you know I have sold the Cullinane farm,' and I said, 'I didn't see any transfer of the place, but Mr. Swisher living near the place came to my house, saying that a lady in Chicago had written him to ascertain the amount, and that she would send a check, and I presumed from that you had sold it.' He says: 'Yes; I have sold that farm.' He says: 'That was the bargain; she was to pay the taxes.' and I says, 'I will give him the receipt after receiving the check.' He says: 'I am going back to Ohio.' I think he said he wanted to go for the holidays. Anyway, I concluded he was going back that day, and he says, 'I will return soon to Dowagiac, and I will be in here to settle with Mrs. Middleton,' and wanted me to have her here, and I said I would get her by telephone, and would let him go, and he says, 'All right,' and that was the last I saw of him.

"*Q.* Now, then, did he ask you anything—what did he say particularly about settling it?

"*A.* He asked me if it was necessary for Mrs. Middleton to be here. I says: 'Yes; of course, I heard the bargain and understand the bargain.' And he says, 'All right,' he would let me know, and I could get her here, and 'I will settle with her just as we talked.'

"*Q.* According to the agreement?

"*A.* Yes, sir.

"*Q.* That would be one-fourth to Mrs. Middleton and three-fourths to Mr. Dill?

"*A.* Yes, sir."

A daughter of this witness testified that she was present at this last conversation.

"*Q.* Now, will you tell the jury, as near as you can, what the conversation was?

"*A.* Do you mean in reference to the Cullinane—

"*Q.* (Interrupting) Yes, in reference to your auntie's claim in the Cullinane property?

"*A.* He said that he had been down in Ohio, and had to go back again, and he said when he came back he wanted to settle up with Mrs. Middleton about the Cullinane farm. Is that correct?"

These witnesses were contradicted as to the last transaction by two or more men, who testified that they were present on that occasion. Caster was the only witness to the other conversation; both Dill and his wife being dead. Manifestly plaintiff could not testify by reason of the statute.

Dill went into possession on April 3, 1898, when his title matured. He afterwards sold the farm for $6,300, and deeded the premises on October 14, 1905. The claim filed was, "To proportionate mortgage share of sale of Dennis Cullinane farm in Silver Creek $2,500." The recovery was for $1,500 and a small amount of interest aggregating $1,575. The theory on which the plaintiff's counsel rest the right to a verdict is that the proceeds of the farm constituted a trust fund, in which the plaintiff had an interest. We have quoted the substance of the testimony relied on to establish a trust. The alleged agreement to sell this land and divide the proceeds was made in 1898, and was manifestly void under the statute

of frauds. That was seven years or thereabouts before the sale of the land by Dill. Therefore there was not at that time a fund in existence in which a trust could be created by parol. In this respect the case is similar to *Rapley* v. *McKinney's Estate*, 143 Mich. 513 (107 N. W. 101), which followed *Collar* v. *Collar*, 86 Mich. 513 (49 N. W. 551, 13 L. R. A. 621).

The evidence is wanting as to a subsequent contract. The parties never met afterward, and the only semblance of a subsequent declaration of a trust was the alleged statement to Caster, made seven years later, that he "was going to Ohio, but would return soon to settle with Mrs. Middleton, * * * and would settle with her just as we talked." This was not said to the plaintiff, nor to an agent of hers. There is not the least evidence that Dill ever made a new contract or agreement or promise with or to plaintiff. On the contrary, the record conclusively shows that he did not. *Rapley* v. *McKinney's Estate, supra;* *O'Neil* v. *Greenwood*, 106 Mich. 572 (64 N. W. 511). We said in *Hamilton* v. *Hall's Estate*, 111 Mich. 291 (69 N. W. 484):

"But it is contended that in order to establish a parol trust the evidence must be very clear and satisfactory, and find some support in the surrounding circumstances and in the subsequent conduct of the parties. This rule is sustained in *Crissman* v. *Crissman, supra* [23 Mich. 216], as well as in *Allen* v. *Withrow*, 110 U. S. 119 (3 Sup. Ct. 517); *Bailey* v. *Irwin*, 72 Ala. 505; 1 Perry on Trusts, §§ 77, 86. To create a trust where the donor retains the property, the acts or words relied upon must be unequivocal. *Young* v. *Young*, 80 N. Y. 422 (36 Am. Rep. 634); 27 Am. & Eng. Enc. Law (1st Ed.), p. 56, and cases there cited. And this rule applies with peculiar force where it is claimed that the donor constituted himself trustee. *Williamson* v. *Yager*, 91 Ky. 282 (15 S. W. 660, 34 Am. St. Rep. 184). In *Beaver* v. *Beaver*, 117 N. Y. 421, 428 (22 N. E. 940, 6 L. R. A. 403, 15 Am. St. Rep. 531), which was cited with approval by this court in *O'Neil* v. *Greenwood*, 106 Mich. 572 (64 N. W. 511), it was held that, 'to constitute a trust, there must be either an explicit declaration of trust, or circumstances

which show beyond reasonable doubt that a trust was intended to be created.' The mere declaration of an intention or purpose to create a trust, which is not carried out, is of no value, and a mere agreement or statement of an intent to make a gift in the future is not sufficient. It must be such that from the time it is made the beneficiary has an enforceable equitable interest in the property, contingent upon nothing except the terms imposed by the declaration of the trust itself."

The judgment is reversed, and a new trial ordered.

MONTGOMERY, C. J., and OSTRANDER, MOORE, MC-ALVAY, BROOKE, BLAIR, and STONE, JJ., concurred.