BOYER *v.* BACKUS.

1. TRUSTS—SPENDTHRIFT—CONTROL—ESTATE OF BENEFICIARY—IN-TENT.

Conveyance clause of spendthrift trust, established by wealthy father in himself and two other trustees for benefit of son, who had bad habits and but very limited intelligence, and gave trustees uncontrolled discretion as to payment over to son of so much of the income as they thought best, *held*, not to have intended to create an estate for the son, which he could control or leave to his wife, by stating that named persons were trustees for said son, his heirs, representatives, legatees, and assigns, in the face of explicit limitations preventing son from ever gaining an interest in the trust property.

2. SAME—PREFERRED STOCK—INCOME—DISTRIBUTION TO SPENDTHRIFT BENEFICIARY.

Proceeds from preferred stock, received by trustees under spendthrift trust providing that stock dividends should become part of the principal of the trust estate and giving trustees uncontrolled discretion as to payment of income to beneficiary, *held*, not distributed income to such beneficiary, hence a part of his estate, where such stock was received upon recapitalization of the corporation, was subject to redemption, was redeemed about two years after issuance and placed in savings account in name of trustees subject to their withdrawal and subject to direction to pay a monthly sum to beneficiary's wife.

3. SAME—SPENDTHRIFT TRUST—DISCRETION OF TRUSTEES.

Under instrument setting up a spendthrift trust whereby trustees were invested with entire legal and equitable title to trust funds with uncontrolled discretion as to amount of income they might think best to pay over to the beneficiary who was wayward son of settlor, but reserving to sole determination of settlor, who was also one of the three trustees, the amount to be paid to son during settlor's lifetime, a majority of the trustees had a duty to act together in performing any discretionary function except distribution of income during lifetime of settlor.

4. Evidence—Presumptions as to Execution of Trust by Trustee.
   A trustee who has executed a trust is presumed to have done his duty.

5. Same—Acts Presumed Legal.
   When an act will be rightful if given one legal effect, but wrongful if given another, it will be presumed that the former was intended.

6. Trusts—Discovery—Accounting—Breach of Trust—Income.
   In suit by widow of beneficiary under spendthrift trust, settled upon him by father who was also one of the three trustees, for discovery and accounting by executors, trustees and legatees of estate of father who survived his son and to whom *corpus* reverted upon death of son without issue in order to recover income alleged to have been distributed by trustees to father who had sole discretion as to amount which should be paid son, by placing same under father's sole control in savings deposits and safety deposit boxes, plaintiff may not complain because father executed the trust alone since suit is not for breach of trust.

7. Same—Distribution of Income by One of Several Trustees—Savings Account.
   Under instrument whereby settlor established a spendthrift trust for his son, designated himself as one of the three trustees and sole person to vote stock of which *corpus* was comprised and to make distribution to or for son, the opening of a savings account in the name of himself as trustee was improper unless funds therein were distributed as a majority of the trustees should have acted together in performing discretionary functions except distribution of income.

8. Same — Spendthrift — Distribution — Income — Presumptions—Evidence.
   Presumption that income under spendthrift trust which was distributable at discretion of majority of three trustees was distributed by action of the settlor, who was one of the trustees, and who placed the income in a savings account and designated himself as sole trustee thereof, since trustee would not be presumed to administer trust improperly, merely made out a *prima facie* case rebuttable by competent evidence.

9. Same—Spendthrifts—Distribution—Income—Evidence.
   In suit by widow of beneficiary of spendthrift trust for discovery and accounting as to funds alleged to have been distributed

by settlor who was one of the three trustees and who placed income in savings account in settlor's name as trustee, evidence *held*, to rebut presumption that settlor had an intention to create a secondary trust in favor of beneficiary or to show an intent to build up an estate for him to which plaintiff would be entitled as sole legatee under beneficiary's will and administratrix with will annexed.

10. GIFTS—BANK ACCOUNTS—EVIDENCE—INTENT.
   The placing of sums in a bank account in the name of another does not alone evidence a gift.

11. TRUSTS—ESTABLISHMENT—BANK ACCOUNTS.
   The placing of sums in a bank account as trustee for another does not of itself establish a trust.

12. SAME—PERSONALTY—PAROL EVIDENCE.
   A trust of personalty is not within the statute of frauds and its existence and terms may be shown by parol.

13. SAME—PERSONALTY—INFERENCES.
   The existence of a trust of personalty may be inferred from the facts and circumstances of the particular case.

14. SAME—RETENTION OF PROPERTY BY DONOR—PAROL EVIDENCE.
   When a donor retains the property, a trust by parol declaration must be created by acts and words of a clear and unequivocal character.

15. SAME—PAROL TRUST—CREATION—BENEFICIARY'S INTEREST.
   The nature and extent of the beneficiary's interest in a parol trust must be made certain before such a trust will be created.

16. SAME—PERSONALTY—PAROL DECLARATION.
   The evidence to establish a trust of personalty by parol declaration must be found in the surrounding circumstances and the subsequent conduct of the parties.

17. SAME—SPENDTHRIFTS — SECONDARY TRUST — UNEQUIVOCAL ACTIONS OF PARTIES.
   In suit by widow of beneficiary of spendthrift trust to recover income and accumulations therefrom, which was distributable to beneficiary at the discretion of a majority of the three trustees, by means of secondary trust alleged to have been established by settlor who was also one of the trustees by opening savings account in his name as sole trustee, the unequivocal actions of the parties *held*, opposed to the existence of such a trust to which beneficiary would be entitled.

18. Same — Bookkeeping — Creation of Secondary Trust — Evidence.

Manner in which settlor, one of the three trustees under spendthrift trust and who assumed active control and management thereof, kept his personal books, wherein he made charges for expenditures on behalf of the trust or personal expenditures for beneficiary thereunder from own funds and reimbursed himself from savings account he maintained in his own name as sole trustee, in which income and accumulations had been deposited, and entry in his own books of beneficiary's personal and trust investment expenditures in same manner *held*, not indicative of establishment of a secondary trust of funds distributed to beneficiary and which became a part of his estate.

19. Same—Parol Secondary Trust—Income Tax Returns—Refunds.

Parol secondary trust of income and accumulations from spendthrift trust which had been deposited in savings account by one of the three trustees *held*, not established by fact that fiduciary income tax returns of trustee and returns of beneficiary were inconsistent with each other and with provisions of the spendthrift trust or by fact that refunds of income taxes were collected by widow of beneficiary as administratrix of his estate with will annexed.

20. Same—Secondary Trust—Fake Ledger—Evidence.

In suit by widow of beneficiary under spendthrift trust for discovery and accounting by executors, trustees and distributees of estate of settlor who was one of the trustees under the spendthrift trust and who dominated and managed it, finding that secondary trust of funds distributed to beneficiary, was created by him *held*, not required by fact that a so-called "fake ledger" was written up, where careful examination of undisputed records and papers and beneficiary's own action in a court proceeding establish no such secondary trust.

Appeal from Wayne; Callender (Sherman D.), J. Submitted October 20, 1937. (Docket No. 121, Calendar No. 39,757.) Decided December 15, 1937. Rehearing denied February 25, 1938. Reconsideration of denial of rehearing denied June 30, 1938. See opinion thereon, *post*, 701. Certiorari to Supreme Court of the United States denied November 7, 1938.

Bill by Laura Miller Boyer, administratrix with will annexed and sole legatee under the will of Myron L. Boyer, deceased, against Standish Backus and others, executors and trustees under the will of Joseph Boyer, deceased, and others to recover possession of certain stocks, bonds.and cash retained in a trust and for an accounting and other relief. Decree for plaintiff. Defendants appeal. Plaintiff cross-appeals. Reversed and bill dismissed.

*Howard H. Campbell and Hollis Harshman (John S. McDonald,* of counsel), for plaintiff.

*Butzel, Eaman, Long, Gust & Bills (Thomas G. Long,* of counsel), for defendants.

NORTH, J. Plaintiff is the widow and sole legatee and administratrix with the will annexed of the estate of Myron L. Boyer, who died without leaving issue on December 29, 1928. She brought suit for discovery and accounting, and the recovery of specific stocks, bonds and cash which she claims belonged to Myron L. Boyer, and at the time of his death were in the possession of Joseph Boyer under a trust, the terms of which were never expressed in writing. Plaintiff contends that this trust arose out of the distribution of certain sums under a previous written trust indenture, dated December 24, 1913, and referred to as exhibit 1. Joseph Boyer died 20 months after Myron, and the executors and trustees of his estate, his daughters, together with the executors of the estate of his son Frank, as residuary legatees under the will of Joseph Boyer, and the Burroughs Adding Machine Company, are made defendants. As plaintiff claims that a new or secondary trust was created upon the alleged distributions of income to Myron under exhibit 1, it becomes essential to set forth the main provisions of this ex-

hibit and also to discuss all the circumstances and conditions at the time of its creation and thereafter.

We must look to the exhibits in the case for many of the facts and it becomes necessary to detail the facts with some particularity because of the nature of the issues involved. Joseph Boyer, the settlor in exhibit 1, on December 24, 1913, was over 65 years of age. He was a very wealthy man who had accumulated a large fortune through investments in the Burroughs Adding Machine Company, which had grown from a small business. Its predecessor, the American Arithmometer Company, was organized in St. Louis, Missouri, in 1886, with a capital of $100,000. Its growth and success indicate the thrift and business judgment of Joseph Boyer who was actively associated with the company from its very start. The business was moved to the city of Detroit in 1904. In 1913, the company's authorized capital had increased to $5,500,000. Mr. Boyer remained the owner of over one-fifth of the capital stock after distributing 7,000 shares in the creation of the trusts herein described. He was president and chairman of the board of the company.

On December 24, 1913, he created a trust for each of his seven children and turned over 1,000 shares of Burroughs Adding Machine Company stock to himself, Alvan Macauley and C. W. Gooch, as trustees for each trust. Gooch and Macauley were both directors of the company and men in whom Mr. Boyer imposed confidence, which evidently was reciprocated, as shown by the manner in which they permitted him to manage the trusts without their active cooperation. They obviously took but little risk as he was a man of enormous wealth, business ability and naturally interested in the welfare of his children. The trusts to Joseph Boyer, Jr., to

Frank and to Myron L. Boyer differed from the others in that they contained stringent provisions such as are usually inserted in spendthrift trusts.

Myron L. Boyer was a person of bad habits and of but very limited intelligence. According to the testimony of plaintiff, who stated she had known him for 17 years prior to her marriage to him, he had always been addicted to drinking to excess and his habits did not change at any time while she knew him except for a period of six months when, with the exception of one interval, he remained sober. He had been sent to various sanitariums and died shortly after returning from one in Guelph, Ontario. Plaintiff states that when she married him, he had been suffering from some kind of injury which she hoped to have cured by the Mayo brothers at Rochester, Minnesota. She testified that she went with Myron when he attended the third grade of the night school for a short time after their marriage; that he later began an electrical course, but gave it up very shortly. Myron's father hired a tutor for him at $125 a month. Myron's income tax returns introduced in evidence show that during the entire period from 1916 up to 1928, his total earnings aggregated $966.21. Plaintiff stated that Myron may have worked at the Burroughs Adding Machine Company for a week or two at a time, but never continuously. She stated that she could not remember when she and Myron last lived together, though they were on friendly terms as evidenced by a letter written by him shortly prior to his death. It is quite significant that from the time of the execution of exhibit 1 up to that of Myron's death 15 years later, Joseph Boyer did not turn over more than a very small sum per month directly to Myron, except on one or two occasions. Moneys for the support of Myron and his

wife were paid direct to the wife, or to those who furnished Myron with merchandise, professional services, or maintenance. Plaintiff was Myron's second wife. She and Myron lived in Joseph Boyer's home for a considerable time after their marriage. For a long period prior to Myron's death, Joseph Boyer was giving her $500 per month and charging it to Myron's trust account. A natural inference would be that Joseph Boyer did not see fit to trust Myron with any large sums at any time after exhibit 1 was executed.

Important parts of exhibit 1 are as follows:

"First. * * * The trustees are hereby expressly vested with the full and complete legal and equitable title to all of the shares of said stock constituting the trust estate, until the termination of the trust hereby created, subject only to the obligation to execute this trust in accordance with the provisions of this instrument; and this conveyance is made upon the express condition that no interest in the *corpus* or body of the trust hereby created shall vest in any person or persons except the trustees or their successors until the termination of this trust."

Second. The stock is to be voted by the trustees with, however, sole power to vote such stock in Joseph Boyer during his lifetime.

"Third. The trustees shall collect, have, take and receive all income of the trust estate, whether arising from dividends, earnings or other revenue, issues, rents and profits thereof, and may, in their uncontrolled judgment and discretion, pay over so much of said income to my said son, or to his issue, if any, as they deem advisable, and may use so much thereof as they think best, for his benefit, or for the benefit of his issue, if any, in any other manner, and

shall invest the balance not so used in such securities and real and personal property as they think best; and when so invested, the same shall become and be a part of the principal of the trust hereby created. During my lifetime, the amounts to be paid to my said son, or otherwise used for his benefit, or for the benefit of his issue, if any, shall be determined by me. * * * In case the company shall declare and distribute any stock dividends upon the shares of stock constituting the trust estate, the shares so distributed as a stock dividend, shall become and be a part of the principal of the trust estate, and shall not be treated as income thereof, it being my desire that the proportionate interest in the business and property of the company represented by the shares of stock of the company now or at any time hereafter constituting the trust estate, shall be maintained intact, or shall be increased, but shall not be allowed to diminish during the continuance of this trust, except as herein otherwise provided. * * *

"Fourth. This trust shall continue during the natural life of my said son and shall terminate upon his death, if he die leaving no issue him surviving, or leaving only children by adoption, or only stepchildren, and thereupon the entire trust then on hand, both principal and interest, shall revert to me, if living; otherwise it shall become and be a part of the residue and remainder of my estate, and the trustees shall immediately pay over and deliver the entire trust estate to me, or to my executors, or to any other persons entitled to receive the same. * * * But if my said son shall die leaving issue (other than children by adoption or stepchildren) him surviving then this trust shall continue for a further period of 21 years from and after the day of his death, and shall then cease and determine; and thereupon, the entire trust estate then on hand, both principal and income, shall vest absolutely in such issue.''

Fifth. Provides for additions to the *corpus* by way of gift by the settlor or other persons.

Sixth. Provides for the manner of issuing and holding and transferring of the certificates of stock.

"Seventh. The action of a majority of the trustees, except as otherwise herein stated, shall constitute the action of the trustees and shall have the same effect as if consented to by all. At any meeting of the trustees, any trustee may vote in person or by proxy to any other trustee," with further provisions as to their compensation and responsibility. Each trustee is exculpated from all liability through action or nonaction except for his own individual malfeasance or neglect.

Paragraph eight applies to resignations, removals and appointment of trustees and their successors, and particularly states that Joseph Boyer, settlor, during his lifetime can, at his option, remove any of the other trustees and appoint their successors.

Ninth. Provides for the qualifications of the trustees.

Plaintiff claims that the conveying clause of the trust instrument, which states that Joseph Boyer, Alvan Macauley and C. W. Gooch are "trustees for said Myron L. Boyer, his heirs, representatives, legatees, and assigns," shows that Mr. Boyer intended to create an estate for Myron which Myron could control or leave to his wife. This contention cannot stand in the face of the explicit limitations preventing Myron from ever gaining an interest in the trust property.

Plaintiff does not question the validity of the provision for accumulation of income within the trust under the power given in paragraph 3, but claims that no income was accumulated. After the creation of the trust, Joseph Boyer proceeded to administer

it largely in his own discretion, only occasionally conferring with the other trustees in the matter of investments. Just what contacts Mr. Boyer had with Gooch and Macauley is not made clear, except that the exhibits show that they were fellow directors in the Burroughs Adding Machine Company. That they were consulted about several transactions is shown by letters introduced in evidence and hereinafter discussed.

On the same day that the trust was executed, Mr. Boyer wrote the following letter to the Burroughs Adding Machine Company:

"December 24, 1913.
"Burroughs Adding Machine Company,
"Detroit, Michigan.
"*Gentlemen:*
"Referring to the 1,000 shares of the capital stock of the Burroughs Adding Machine Company, standing in the name of Joseph Boyer, Alvan Macauley and Claiborne W. Gooch, trustees for Myron L. Boyer, please deliver the certificate or certificates therefor to Joseph Boyer, as custodian thereof on behalf of the trustees named.

"Also, until further notice, please send all dividend checks for dividends hereafter payable on said shares of stock directly to, and payable to the order of Joseph Boyer, who will receive the same on behalf of the trustees.
"Very truly yours,
"JOSEPH BOYER."

On December 26, 1913, Mr. Boyer signed an order on Mr. Chapman, a director and secretary of the company and evidently in charge of dividend disbursements, directing him to have the dividend checks on stocks standing in the names of the trustees for the four daughters made payable to them and

the checks for the sons payable to Mr. Boyer. It seems evident that Mr. Boyer, as president and chairman of the board of directors, exercised a dominant position in the Burroughs Adding Machine Company, and his orders were observed even though the lack of formal instructions signed by proper parties might have later involved the company in difficulties. On December 31, 1913, just a week after the creation of Myron's trust by the execution of exhibit 1, a dividend of $4 a share was paid on the Burroughs stock. Mr. Boyer must have known of the earnings of the company on December 24, 1913, and the probability of its continuing to pay regular quarterly dividends. On the date of the payment of this dividend, Joseph Boyer opened an account in the name of Joseph Boyer, trustee, with the Michigan Savings Bank, referred to as savings account 43100, which number the account retained in the banks that succeeded the Michigan Savings Bank. The original signature card at the bank was signed "Joseph Boyer, trustee," and on the back of it there is a typewritten order signed by him directing the bank to remit $100 per month to Myron Boyer and $50 per month to Carrie E. Boyer, Myron's first wife. The bank wrote on its ledger after the title of "Joseph Boyer, trustee," the names of Myron L. Boyer and Carrie E. Boyer, preceded by a bracket. These words have no probative force whatsoever except to show that, in accordance with instructions, the bank was to send $150 to Myron L. Boyer and Carrie E. Boyer. It was not shown that Joseph Boyer had anything whatsoever to do with the way the bank clerk set up the ledger card. No commercial account was ever opened for the trust. Thereafter the trust estate rapidly increased in size, through stock dividends, additional gifts by Joseph

Boyer, accumulations and purchases with the income of the trust.

There were purchased in 1917 and 1918, $50,000 of Second Loan Liberty Bonds and $25,000 of Fourth Loan Liberty Bonds, all of which were subsequently sold at a slight loss. An undated letter was introduced in evidence signed by all three of the trustees approving the purchase of these bonds and payment for them out of the trust, but the letter must have been signed at least subsequent to the purchase of the $50,000 of bonds. Other bonds were purchased from time to time; some were sold.

On February 1, 1917, a 200 per cent. stock dividend was declared by the Burroughs Adding Machine Company, and 2,000 shares thus were added to the *corpus* of the trust. On October 18, 1919, Mr. Boyer made an additional gift of 2,000 shares of stock to the trust, thus increasing the number of shares in the *corpus* to 5,000. In 1920, the Burroughs Company by proper resolution increased its capital by 50 per cent. The stock was selling at a high premium and the rights to subscribe to a share of stock were selling at $75 a share. As each share was entitled to one-half of a right, a whole right sold at $150. The value of the rights on the 5,000 shares of *corpus* was $375,000. A subscription warrant of 2,500 shares was issued to the three trustees. The following undated letter signed by all three trustees was found in the files of the company when the present secretary took charge in 1922:

"The undersigned, trustees under that certain trust instrument made by Joseph Boyer to them as trustees for Myron L. Boyer, under date of December 24, 1913, do hereby approve and join in the doing on behalf of the trust created by said instrument of the following:

"The subscribing to the *pro rata* portion of the increase of the capital stock of Burroughs Adding Machine Company authorized by resolution of the stockholders of said corporation on, January 16, 1920, said *pro rata* portion being 2,500 shares;

"The borrowing of the funds requisite therefor;

"The pledging of shares of stock belonging to said trust as security thereof, and

"The renewal of such obligation and pledge from time to time until the funds of said trust shall be adequate fully to pay the same;
intending by the signing hereof to join in the same as fully and effectually as though affixing each of our names to each and every instrument appropriate thereto.

> "Joseph Boyer
> "Alvan Macauley
> "C. W. Gooch."

It required $250,000, less a small discount for cash, to acquire the additional 2,500 shares. The amount on deposit in savings account 43100 was insufficient to pay the entire purchase price for the 2,500 shares. The sum of $44,031.25 was withdrawn from account 43100 and the balance was raised by the discount of a note of $200,000, signed by Joseph Boyer, trustee, and indorsed by him personally and 2,000 shares of Burroughs stock, belonging to the trust, were deposited as collateral. The note was eventually paid off through withdrawals from savings account 43100.

In 1922, it was found desirable to sell some of the Burroughs shares to that company. Various members of the family of Joseph Boyer joined in selling stock for which $160 per share was received. Eight hundred shares belonging to the Myron Boyer trust were thus sold and the savings bank book shows $128,000 was deposited and $95,000 was withdrawn the following day in order to pay the balance due on the note still outstanding. Before the 800 shares

were sold, however, Messrs. Macauley, Boyer and Gooch signed the following letter: ·

"The undersigned, trustees under that certain trust instrument made by Joseph Boyer to them as trustees for Myron L. Boyer under date of December 24, 1913, do hereby approve and join in the sale to Burroughs Adding Machine Company of 800 shares of the capital stock of said Burroughs Adding Machine Company which now belongs to the trust estate held under the said instrument of trust at and for the price of $160 per share intending by the signing hereof to join in such sale as fully and effectually as though affixing each of our names to the assignment of the certificates representing said shares of stock and of each and every other instrument which may be appropriate to effect such sale.

"The undersigned do further hereby approve and join in the paying out of the funds derived from said sale of the moneys borrowed and now remaining unpaid on account of the subscription to the *pro rata* portion of the increase of the capital stock of Burroughs Adding Machine Company authorized by resolution of the stockholders of said corporation on January 16, 1920.

"Alvan Macauley
"Joseph Boyer
"Claiborne W. Gooch."

The letter was not dated but was identified as being part of the company's records by Mr. Evans, the secretary. After the sale of the 800 shares, there were 6,700 shares left in the trust. This number was increased by 1,675 shares through a stock dividend on August 15, 1922, thus bringing the total up to 8,375 shares. In July, 1924, efforts to secure greater marketability for the stock and also to enable stockholders to diversify their investments without substantially changing their respective interest in the corporation culminated, through the assistance of

New York bankers, in a complete reorganization of the financial structure of the company. By appropriate corporate action, each share of $100 par stock was *exchanged* for two shares of stock of no par value and one-half of a share of preferred stock of $100 par value. The terms of the preferred stock conformed with the laws of the State of Michigan. The holders were entitled to receive cumulative dividends at the rate of 7 per cent. per annum, payable quarterly. There was a provision for redemption at par on the 30th day of June, 1954, or redemption in whole or in part, prior thereto, at the option of the board, at a certain premium varying and dependent upon the time the stock was called. The certificate further provided for the creation of a sinking fund and forbade certain acts without the consent of the holders of two-thirds of the preferred stock then outstanding, and further denied the right to preferred stockholders to vote unless there was a default of over 60 days in payment of the dividend of the stock, or unless there was an impairment of capital. The trustees thus received 4,187½ shares of preferred stock which the company redeemed at par plus a premium on September 30, 1926. The $439,635 received on redemption was deposited in savings account 43100. Plaintiff contends that the preferred stock issued on recapitalization was in reality an extraordinary dividend eventually paid in cash and should be treated as income distributed to Myron under the trust instrument. We are not in accord with plaintiff's contention.

On October 18, 1922, Mr. Boyer executed a written instrument in which he stated that, in accordance with the provisions of the trust instrument, he removed Messrs. Gooch and Macauley and appointed as their successors James S. Holden and Albert E.

Green of Detroit. The latter two accepted the trust imposed upon them by this supplemental instrument. Mr. Holden testified that he was managing chairman of the board of the Security Trust Company and that Mr. Green was president, and that Mr. Boyer came to visit him frequently at the trust company's office to discuss with him the purchase of bonds; that he understood it was Mr. Boyer's policy to take the dividends that came from stock and invest them in bonds; that Mr. Boyer was more conservative than Mr. Holden, who also testified that he had considered himself responsible for the investment of the trust funds. On June 8, 1926, Mr. Boyer wrote the bank asking them to change the name of the account (43100) to the names of the three trustees. Cards with Holden's and Green's signatures were inclosed. All checks deposited thereafter, including the one for the redemption of the preferred stock, were indorsed with a rubber stamp stating "For deposit to the credit of Joseph Boyer, James S. Holden, Albert E. Green, trustees * * * for Myron L. Boyer."

The various securities purchased by Boyer for the trust were kept by him in safe deposit boxes, either in a separate compartment in a large box of Joseph Boyer or in a separate box, in the name of "Joseph Boyer, trustee," until 1927, when they were placed in a safe keeping account with a trust company under the names of the three trustees.

Joseph Boyer's procedure in administering the trust for Myron and also for another son and his method of accounting were quite complicated. He never opened a commercial account for either trust. As 43100 was a savings and not a commercial account, no checks could be issued against it when Mr. Boyer wished to make an expenditure for Myron or for the trust. Consequently, he would personally

pay out moneys and make advances for Myron's use or for the trust with his own checks or currency and then reimburse himself by withdrawals from 43100.

A set of books was opened for Joseph Boyer in 1914 by a responsible firm of accountants. These included a ledger for all his own transactions. There were also loose leaf ledger pages in a book entitled "Investment Ledger," that related to Myron and another son for whom also a similar trust had been created. These pages ostensibly were an account with Myron personally and there is no indication on their face that they were an account with the trust. However, whenever Mr. Boyer issued one of his own checks to purchase securities for the trust, he charged it against Myron's account and then when he reimbursed himself by withdrawals from 43100, he credited Myron with that amount.

Income tax returns were made for Myron and for the trust. They will be hereinafter discussed. Joseph Boyer employed a bookkeeper by the name of R. S. Mielert, who went to the Boyer residence twice a week, wrote up Mr. Boyer's personal books and kept track of the various trusts. Payment for his services was charged against the trusts. Mielert was not a good accountant. His knowledge of the income tax law was limited. Had he opened a proper set of books at the beginning for the trust and made the income tax reports correctly, the present litigation might have been avoided.

Plaintiff claims that the entire income of the trust was distributed for the benefit of Myron and that when it was placed in savings account 43100, through which almost all sums were cleared, it became part of a second or secondary trust; that this trust did not revert to Joseph Boyer; and that, therefore, defendants should be ordered to transfer to her all

cash to the credit of Myron's trust at the time of his death and all of the stock, including that of the Burroughs Adding Machine Company, and bonds purchased for the trust, and for which payment was made through withdrawals from savings account 43100. While plaintiff's attorneys call the trust a secondary trust, they claim it is an independent trust that arose out of distributions from exhibit 1, and therefore, that it is a new trust, completely severed from the trust in exhibit 1. We adopt plaintiff's construction of the term "secondary trust" in the present discussion.

Plaintiff relies on the following propositions to prove distribution and the existence of a secondary trust: Joseph Boyer, trustee, was charged with the duty to administer the trust in exhibit 1 in cooperation with the other trustees, except when he was distributing to Myron; that, therefore, it is presumed that he was distributing to Myron when he kept sole control of savings account 43100, of the various securities placed in safe deposit vaults solely in his own name, and practically controlled all investments, taking certificates of the Truscon Steel Company preferred stock in his own name as trustee for Myron Boyer; that income tax returns were made showing all income as distributed to Myron, and that Joseph Boyer by his actions and in the manner heretofore detailed, treated the income and investments made therefrom as Myron's property.

Plaintiff's attorneys further assert that the fraud that witness Mielert attempted to perpetrate through presenting what they term a "fake ledger," is additional and almost conclusive proof of plaintiff's contentions. We have only mentioned the main points raised. We have not overlooked others, which limitations of time and space prevent us from

more fully discussing. In the last analysis such discussion of details of minor importance to which we attach no significance will not benefit the profession or change the result.

Defendants, on the other hand, insist that no such secondary trust was ever created; that while Joseph Boyer did run the trust with but little participation of cotrustees, he nevertheless fully accounted for everything; and that if the cotrustees were willing to take the responsibility without more active participation, neither Myron nor his estate could complain. They further show that the income tax reports were improperly made out, and that later on amended returns were filed and a large refund was paid back by the government; that the refund checks were delivered to plaintiff's attorney, but under circumstances so as not to constitute an admission on the part of defendants. They further show that even were there any basis for plaintiff's claims, they could not extend to the preferred stock, which was a return of capital, in no sense an extraordinary dividend, nor to any income deposited after the title of the bank account (43100) was changed to the names of all three trustees. Defendants further contend that even if there were any justification for recovery on the part of plaintiff, she is precluded from bringing the present suit because of a previous suit brought by Myron in his lifetime, setting forth the trust and all accumulations thereof, and asking that the birth certificate of a certain baby be set aside. It was decreed that Myron was never the father of the baby. Defendants claim that the purpose of this hoax or trick played by plaintiff was to acquire control of the *corpus* of the trust and all accumulations. Defendants further contend that plaintiff presented a claim similar to the present one before the com-

missioners on claims of the estate of Joseph Boyer, that it was disallowed, and that the matter is *res judicata*. They further claim that plaintiff's laches and failure to present her claim until after conditions changed and inheritance and estate taxes, amounting to about 20 per cent. of the net assets of the Boyer estate, had been paid, precluded her from now asserting the claim; that the failure to present her claim even in different form, in proper time, before the commissioners was also fatal to any rights claimed by plaintiff.

The judge in a carefully prepared opinion covering 200 printed pages made findings in favor of plaintiff on all her claims except that to stock in the Burroughs Adding Machine Company, all of which the court found was a part of the *corpus* of the trust.

The five-volume record has been very carefully examined. At the outset, we are met with difficulty in understanding just what plaintiff means by the so-called secondary trust. At most, it can mean that all of the income from the trust under exhibit 1 passed to Joseph Boyer as trustee or agent for the benefit of Myron Boyer, the former having the exclusive right, under paragraph three of the trust, to determine the amounts to be paid to Myron or otherwise used for his benefit. Although plaintiff contends otherwise, she cannot recover without proving the existence of the secondary trust. If any income was distributed, it must have been transferred to such trust, for Joseph Boyer never indicated that he held any cash or securities for Myron other than as trustee and only a very small part of the income of the trust under exhibit 1 was ever transferred into the actual possession of Myron or used for the immediate benefit of himself, or his wife.

Plaintiff claims that it must be presumed that Joseph Boyer distributed whenever he acted without the concurrence of the other trustees, since he would have been breaching his trust if he intended to administer solely in his own discretion the trust under exhibit 1. It is true that under this trust instrument at least a majority of the trustees had a duty to act together in performing any discretionary function except the distribution of income. *Loud* v. *Winchester*, 52 Mich. 174; *Shaw* v. *Canfield*, 86 Mich. 1. It is presumed that a trustee has done his duty in executing a trust. *Mackenzie* v. *Los Angeles Trust & Savings Bank*, 39 Cal. App. 247 (178 Pac. 557); *Offenstein* v. *Gehner*, 223 Mo. 318 (122 S. W. 715); *Appeal of Gardner*, 81 Conn. 171 (70 Atl. 653). Likewise when an act will be rightful if given one legal effect, but wrongful if another, it will be presumed that the former was intended. *Brewer* v. *Bowersox*, 92 Md. 567 (48 Atl. 1060); *Blackstone Canal National Bank* v. *Oast*, 45 R. I. 218 (121 Atl. 223).

Joseph Boyer occasionally, although informally, did consult with Mr. Holden, his cotrustee, in regard to investments. We have referred to the letters written by the three trustees in regard to the purchase and sale of stocks and bonds. The court found that the letters were ineffectual to delegate authority to Boyer to act alone. Even assuming this to be true, plaintiff cannot complain since this is not a suit against Mr. Boyer nor any other trustee for breach of a trust. Had Myron died leaving issue and were there any claims of malfeasance or misfeasance, Mr. Boyer's cotrustees could have been charged with neglect. It was their duty to look after the trust and the trustees should have acted in all the more important transactions. If 43100 was not an account of distributed funds, it was improper to place it

solely in the name of only one trustee. All of the
securities were kept part of the time in the name of
Joseph Boyer personally and part of the time in
that of himself as trustee. If these belonged to the
trust under exhibit 1, it was improper for him to
keep the securities where the other trustees could
not have access to them, but it was in conformance
with the method in which the trust was handled,
Joseph Boyer doing the active work and the cotrus-
tees only occasionally acting. The terms of the trust
instrument show that Joseph Boyer was to be dom-
inant. He had the sole right to vote the Burroughs
stock, he alone could make distribution. He could
remove any of the trustees at pleasure and appoint
others in their stead. He told Mr. Holden that he
would attend to the mechanical part of the trust, the
bookkeeping, etc., and would only seek advice from
Mr. Holden in regard to investments. Nevertheless
all of these facts do give rise to a presumption that
Joseph Boyer intended to distribute and did not in-
tend to administer the trust improperly. But this
presumption merely makes a *prima facie* case and
it may be rebutted by competent evidence.

We believe the evidence in the instant case does
not establish such a trust, but on the contrary, re-
buts any presumption of an intention to create a so-
called secondary trust. The trust under exhibit 1
did enable Mr. Boyer to pay moneys over to Myron
for his benefit. In addition to giving him a regular
allowance, large sums were expended for his benefit.
$500 per month was given to plaintiff. Sanitarium
and doctors' bills were paid, an automobile was pur-
chased, and in that sense money was used for his
benefit. We do not believe that the conserving of the
income, however, even though handled by a single
trustee was a distribution to Myron. The settlor was

a careful business man occupying a very high position in the commercial world. He named as cotrustees, subject to removal, men whom he frequently met. Myron was largely the problem of Joseph Boyer, who knew best what to do. It is not strange that the cotrustees largely carried on the policy of noninterference, being well satisfied that Joseph Boyer would do the best he knew to safeguard his son's investments for any issue the son might have, and should there be none, then for his other children. That the faith of the cotrustees in Joseph Boyer was not misplaced is shown by the way the trust grew and prospered under his management and the fact that the *corpus* and accumulations were fully accounted for. The fact that Joseph Boyer acted alone as trustee does not indicate a distribution to Myron.

Plaintiff claims that the actions of Joseph Boyer, trustee, were such as to indicate that he wanted all of the income to go to Myron so as to build up an estate for him. We find not a word to this effect in any instrument. In fact, the trust instrument itself seems to be explicit to the contrary. If there was a secondary or independent trust set up, no duties imposed on the trustee have been shown. Therefore, it would be a dry trust subject to the right on the part of the *cestui* to demand the *corpus* and accumulations at any time; it would be the property of the *cestui* subject to his demands and those of his creditors. It is against reason and common sense to even suppose that a safe and conservative business man like Joseph Boyer with a problem son like Myron, whom he tried to tie up by a rigid spendthrift trust, would, within a week after creating the trust, open a bank account with the intention of destroying the much needed protection that he wanted to give to

his son. The evidence introduced discloses no such intention.

The placing of sums in a bank account in the name of another does not alone evidence a gift. *Peninsular Savings Bank* v. *Wineman,* 123 Mich. 257. Nor does the placing of sums in a bank account as trustee for another of itself establish a trust. *Matter of Totten,* 179 N. Y. 112 (71 N. E. 748, 70 L. R. A. 711, 1 Ann. Cas. 900); *Cunningham* v. *Davenport,* 147 N. Y. 43 (41 N. E. 412, 32 L. R. A. 373, 49 Am. St. Rep. 641); *Slepkow* v. *McSoley,* 54 R. I. 210 (172 Atl. 328), *Frank* v. *Heimann,* 302 Mo. 334 (258 S. W. 1000). However, it cannot be questioned that 43100 was a trust savings account. The question is: Was it the account of the trust under exhibit 1, or was it the account of a secondary trust? There is no formal trust instrument setting up the secondary trust, but a trust of personalty is not within the statute of frauds and its existence and terms may be shown by parol. *Economy* v. *Roberts,* 274 Mich. 484. Its existence may be inferred from the facts and circumstances of the particular case. *Faulds* v. *Dillon,* 231 Mich. 509. Plaintiff claims that the opening of the bank account showed the creation of a secondary trust with terms unexpressed. The opening of such bank account naturally would be incidental to carrying out the terms of the trust established the previous week. When a donor retains the property, a trust by parol declaration must be created by acts and words of a clear and unequivocal character. *Mitchell* v. *Bilderback,* 159 Mich. 483. The nature and extent of the beneficiary's interest must be made certain. *Faulds* v. *Dillon, supra.* The evidence to establish such trust must be found in the surrounding circumstances and the subsequent conduct of the parties. *Hamilton* v. *Hall's Estate,* 111 Mich. 291;

*In re Lane's Estate,* 281 Mich. 70. The actions of the parties, in so far as they are not equivocal, are opposed to the existence of a secondary trust.

An analysis of 43100 shows that not only were the large amounts received as dividends deposited therein, but also part of the *corpus* of the trust under exhibit 1, in which Myron could never have an interest. The proceeds from the redemption of the preferred stock amounting to $439,635 as well as the $128,000 realized from the sale of 800 shares of the original 1,000 shares placed in the trust, were deposited in 43100. Possibly plaintiff may be correct on her cross-appeal in contending that the same line of reasoning which prompted the judge to turn over to her all accumulations and savings would also entitle her to the Burroughs shares, the purchase of which was financed through savings account 43100. However, we do not believe that savings account 43100 became or ever was intended to be separated from the trust created by exhibit 1, but that it was simply a method used for keeping the funds belonging to the main trust and making proper expenditures thereunder. On June 8, 1926, Mr. Boyer wrote to the bank ordering the account to be put in the names of the three trustees. He signed the letter "Joseph Boyer, trustee for Myron Boyer," and the signature cards of the three trustees were deposited at the bank. Plaintiff claims that if moneys then on hand belonged to the secondary trust, a view in which we do not share, Mr. Boyer, as trustee, could not divert them back to the main trust. We believe that the letter does show that Mr. Boyer considered savings bank account 43100 as belonging to the main trust.

Attention is called to the fact that Mr. Boyer called himself "Joseph Boyer, trustee for Myron Boyer." If he had called himself "One of the trus-

tees for Myron Boyer," probably no objections would have been made. The record shows that this is what he meant, for when he voted the Burroughs stock standing in the names of the three trustees, he designated himself, as "Joseph Boyer, trustee," and as "Joseph Boyer, trustee for Myron Boyer." He signed a proxy for the three trustees and receipts for stock certificates, issued to the three trustees as "Joseph Boyer, trustee;" he signed the income tax returns for the main trust as "Joseph Boyer, trustee."

It is also claimed that Mr. Boyer recognized the secondary trust through his reference at times to "Myron L. Boyer's trust" or "Myron's trust." He unquestionably used this term to distinguish it from the trusts for the other children. Joseph Boyer at one time wrote on the back of a copy of trust exhibit 1, the words "Myron's trust." In referring to the note he gave for the purchase of the Burroughs stock, he designated it on his books as "Myron's note." The stock was issued in the name of the three trustees and the purchase was in accordance with the letter signed by the three trustees.

We do not believe that the manner in which Mr. Boyer kept his personal books, wherein he made charges for expenditures on behalf of the trust under exhibit 1 or expenditures for Myron thereunder, is at all indicative of a secondary trust. In *Lombard v. Witbeck,* 173 Ill. 396 (51 N. E. 61), a question was presented whether distribution occurred when the trustee set up a special income trust account for each *cestui.* Although the case was decided on other grounds, the court, also, held that there was not a distribution but that the account was merely a convenient bookkeeping entry. There was no question but that the loose manner in which the records in this case were kept did not conform with good ac-

counting practice. Expenditures for a new automobile for Myron's personal use or for other of his expenses were entered the same as purchases of stocks or bonds. This does not, however, show the creation of a secondary trust. The bookkeeping would be equally as erroneous if the money had been paid out of a secondary trust. We need not refer to other items in Mr. Boyer's books, which show at the most careless bookkeeping, but not a secondary trust.

Plaintiff also relies upon the income tax returns made to the government as proving the secondary trust. The trial judge was largely influenced by them in holding for plaintiff. They appear to have been prepared by Mielert, those on form 1040 for 1920, 1921, 1922 and 1923 were signed by Myron, and those for the other years by Mielert as agent or attorney for Myron. Form 1040 is the personal return of the beneficiary, 1041 that of the fiduciary. The trust was created in 1913 and for the first two years was fairly simple. There was no income tax to be paid, the dividends being exempt and the whole income insufficient to be subject to a surtax. The first fiduciary return for 1916, was filed by "Joseph Boyer, trustee for Myron Boyer." All those thereafter are in the names of all three trustees. The income tax returns are in hopeless confusion. They cannot be reconciled. They were made out by Mielert and they are obviously wrong whether considered in connection with the main trust or the claimed secondary trust. Plaintiff claims that these returns show a secondary trust and also that all income was distributed. Had there been a secondary trust, it would have been necessary to file fiduciary returns, one for the main trust and also one for the secondary trust, but only a single return was filed. secondary trust. Each year they show all of the in-
The fiduciary returns cannot be the returns of the

come as distributed, whereas, from 1913 to 1928, only approximately $123,000, a small part of the total income, was paid to Myron or for the expenses of himself and his wife. If the fiduciary returns were of the secondary trust, they would show only $123,000 as distributed and the rest retained in the trust. Furthermore, such returns were manifestly incorrect if there was a secondary trust. At least part of the income reported in the fiduciary returns was shown to have been received as dividends from the stock which was indubitably held by the trust under exhibit 1. Myron's personal return for 1917 recites that he received dividends not from ''Joseph Boyer, trustee,'' as would be the case if the income was received from a secondary trust, but from the three trustees. The fiduciary returns 1041, each taken separately, do show the total income of the main trust as distributed and Myron's personal returns 1040 show the total income as received by him from the trust. The returns, however, are erroneous and inconsistent, both with each other and with provisions of any trust. Each year they show all of the income as distributed but in the following years they report income from investments purchased with so-called distributed funds. For example, on August 9, 1917, $50,000 Liberty bonds were purchased with funds out of the savings account 43100. On October 15, 1918, $25,000 more were purchased with funds from the same source. Funds in 43100 had all been previously reported as distributed to Myron. Fiduciary returns for 1919 show the interest on these bonds as accruing to the main trust directly and not from any fiduciary. On Myron's personal return for 1919, he reports the interest on the bonds as received from a fiduciary and not as an individual holding. Also, if the interest on the balance in 43100 belonged to a separate fiduciary, it should have been

so returned but it is reported as received from the main trust. The returns are further inconsistent with the provisions of the main trust, but the inconsistency does not prove a secondary trust. We have heretofore referred to the redemption of the preferred stock which was shown in Myron's personal return for 1926 as a capital gain and income to himself. It is clearly erroneous to charge Myron with this capital gain on the *corpus* since under the trust instrument he never had any interest in it. Plaintiff's claim that the issuance of the preferred stock was in effect the payment of a cash dividend is without foundation. Myron's personal return for 1917 charges him with receiving a stock dividend on Burroughs stock, although the return is made under protest. It further states that the stock is "held by Joseph Boyer, Alvan Macauley and C. W. Gooch, trustees." Under exhibit 1 all stock dividends became part of the trust estate in which Myron personally was not to have any interest. Other inconsistencies might be shown, and while it is true that the errors made on forms 1040 and 1041 would be some indication that there was a distribution each year to Myron, when all of the returns are considered together, they plainly show the errors and fail to show a secondary trust. It is little wonder that subsequently when a Mr. Carlin, examiner for the government, went through the records he discovered the palpable errors. Thereupon amended returns were filed with the government for the later years. Those for earlier years could not be amended under the law. Refund checks payable to Myron Boyer were issued. Refund checks for $23,686.85 and $16,400.04, dated November 17, 1928, and $4,225.09 dated December 6, 1928, aggregating $44,311.98, were mailed by the government to Myron L. Boyer, care of Mr. Mielert, who indorsed the first

two checks and deposited them in account 43100. The government refused to accept the indorsement and returned them to the bank. The third check was similarly indorsed and deposited but not sent forward as in the meantime the first two checks had been returned. Myron died on December 29, 1928. The checks were subsequently turned over to the attorney for Mrs. Boyer. The testimony in the case, which is entirely contained in one of the five volumes of the record, consisted very largely of introduction of exhibits. There was constant talk by the attorneys without being sworn and, as a result, many statements were made by them which were not under oath. The attorney for defendants made a statement in regard to the refund checks which was not taken down by the stenographer. It was to the effect that after the checks were received there was no possible way of securing plaintiff's indorsement as administratrix without a lawsuit and Mr. Boyer finally agreed that the refund checks might be turned over to her. On motion, the judge permitted the statement made by defendants' attorney to be put in the record, but he refused to reopen the case so as to permit the attorney to testify under oath as to what actually occurred. We do not believe it necessary to reopen the case so as to have the testimony in sworn form. The checks were made payable to Myron and could only be collected either by his administratrix, or at the end of a lawsuit by parties defendant, and the entire incident does not establish a secondary trust.

The most suspicious circumstance in the case and one that has caused us to examine more carefully all of the records was the introduction by defendants of the ledger referred to as exhibit 267, which showed all of the investments for the trust under exhibit 1, and all receipts and expenditures from the very be-

ginning in 1913, and, if valid, would prove that there was no distribution. This ledger was written up at some time by Mielert, who twice a week would go to Mr. Boyer's residence and attend to all of his private bookkeeping including that of the trusts. Exhibit 267 consisted of a form which had a trade mark "Kadillac Line," etc., on each page. At the top of the first ruled-off column appeared the figures "192—," so that the appropriate year could be inserted in the blank. It is obvious that the sheets were manufactured after 1920, in fact, the trade mark of "Kadillac Line" was not registered until 1921. Mielert positively testified that he began to make these entries in 1914; that they were original entries at the time; and that the accompanying balance sheets were also made at the end of each year during that period. While it might have been advisable in 1914 to get up a ledger for the trustees under exhibit 1, it was not absolutely necessary, since the bank book and Joseph Boyer's books showed the expenditures and the few items of income during the first years, consisting of the quarterly dividends from the Burroughs Adding Machine Company stock. The palpable misstatement or error made by Mielert was discovered after it was shown that he could not have made the entries at the time claimed. Upon being recalled as a witness Mielert testified that he had made a mistake and that he began the entries in 1923. Defendants introduced proof to show that if a ledger were made up even at the present time, the figures themselves would be correct. For this reason, we have carefully examined the items, using what the accountants term a "breaking down" of the figures so as to trace them to their original source. We find them substantially correct, there being but a few items that are in the

least doubtful. They are borne out by the books of Joseph Boyer, the bank book and other documents whose genuineness cannot be successfully attacked. On certain items we must depend upon explanatory memoranda in the pass book for 43100. It is claimed that the government examiner, in making a new and proper analysis of the various returns and causing amended returns to be filed, was misled by the ledger and that it was manufactured solely for the purpose of deceiving the government on the income taxes. We cannot ascribe any such motive to Joseph Boyer. However, we do not accept the classification of accounts as shown in Exhibit 267 as proof that there was no distribution. While the creation of what is called a "fake ledger" has created a cloudy atmosphere in the case and has necessitated a much more careful examination of the figures, we find in defendants' favor upon examination of other documents that are undisputed.

Having reached the conclusion that there was no secondary trust, it becomes unnecessary to dwell at any length on the affirmative defenses submitted by defendants. The affirmative proof by defendants was introduced to show that even had there been a secondary trust, plaintiff was precluded by her own actions and by those of Myron from making the claim. On March 3, 1928, a bill of complaint, signed and sworn to by Myron, was filed in the circuit court for the county of Wayne against the three trustees, the Security Trust Company, a Michigan corporation, and Joseph Andrew Boyer, so-called, an infant. One of the sworn averments is that there is contained in the trust (exhibit 1), in addition to the Burroughs Adding Machine Company stock, approximately $500,000 in bonds and cash of upwards of $100,000. The bill further alleges that plaintiff's

wife was holding out to the public a child called Joseph A. Boyer as a legitimate son of plaintiff; that the said child was an utter stranger in blood, not only to plaintiff, but also to Laura Boyer, but that the legal presumption would be in favor of the legitimacy of said child; that Laura Boyer devised and acted out a pretended pregnancy with the connivance of a physician and nurse, and pretended to give birth to a child, namely the alleged and so-called Joseph A. Boyer. The bill states how Mrs. Boyer tricked Myron by securing a newly-born infant from the Hotel Dieu in Windsor, Ontario, and led Myron to believe that said child had been born in lawful wedlock with the said Laura Boyer. The specific purpose of the bill was to have the birth certificate set aside. It was further alleged that Laura Boyer had taken out adoption papers for the baby in Oakland county, Michigan, and had confessed the trick played on plaintiff. In view of our decision, it is unnecessary for us to comment upon the effect of the suit except to state that it shows that Myron in his sworn bill of complaint did not regard the accumulations of securities and moneys on hand at that time as belonging to a secondary trust.

Plaintiff filed a claim before the commissioners on claims in the Joseph Boyer estate for the sum of $1,200,000 for accumulations and additions under exhibit 1 and not paid to Myron L. Boyer during his lifetime, nor to his heirs nor made a part of the *corpus* of the trust, and which was thereafter "appropriated by Joseph Boyer and his estate, for which an accounting is hereby demanded." Plaintiff claims that she was misled by the "fake ledger" and that the present suit is for the purpose of recovering specific moneys and stocks and bonds in a chancery proceeding, and that it differs from a general claim against the estate.

We also pass over defendants' affirmative proof of laches and the invoking of the statute of nonclaim. We shall not discuss these affirmative defenses, even if they have any other merit, as they are not necessary to a decision in the case.

We must conclude there was only one trust created and all acts were thereunder, or related thereto, without separation of funds therefrom in the sense of accomplished distribution and creation of a secondary or holding trust vesting rights, apart from the reservations contained in the express trust, under which plaintiff takes nothing.

The decree of the trial court is reversed in so far as it allows any recovery by plaintiff and one may be entered dismissing the bill, with costs to defendants.

FEAD, C. J., and WIEST, BUTZEL, POTTER, and CHANDLER, JJ., concurred. BUSHNELL and SHARPE, JJ., did not sit.