SCARNEY *v.* CLARKE.

1. CHARITIES—DEFINITION.

A charity is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burden of government.

2. TRUSTS—CHARITABLE TRUST—CREATION.

A charitable trust may be created by (a) a declaration by the owner of property that he holds it upon a charitable trust; or (b) a transfer *inter vivos* by the owner of property to another person to hold it upon a charitable trust.

3. SAME—EXPRESS TRUST—INTENT.

To constitute an express trust there must be an explicit declaration of trust, or circumstances which show beyond a reasonable doubt that a trust was intended to be created.

4. SAME—CHARITABLE TRUSTS—GIFTS—CLINICS.

In suit for determination of property rights and accounting between physicians, surgeons and dentists interested in a medical-dental clinic, record *held,* to show sum of $120,000 with which clinic was founded was given to defendant as an outright gift and silent as to donor's intention of creating a charitable trust.

5. SAME—CHARITABLE TRUSTS—PUBLIC NATURE—BENEFICIARIES.

In charitable trusts the public is the beneficiary and while it need not be for entire public it must be public in nature and for unascertained beneficiaries.

6. SAME—BENEFICIARIES UNDETERMINED.

The distinguishing characteristic of a charitable trust is that the prospective beneficiary is undetermined and unknown.

7. SAME—CLINICS—NONPROFIT—BENEFICIARIES—PRIVATE RIGHTS.

> In suit between physicians, surgeons and dentists to determine
> property rights in a clinic and for an accounting, where plain-
> tiffs who had joined principal defendant in clinic not for
> charitable purpose of giving medical aid to poor and needy or
> public at cost but for purposes of increasing their own busi-
> ness at a lower operating cost and who do not complain of
> wrong to the public but assert private rights by way of per-
> petual interest for the members in the clinic, *held*, not entitled
> to have property decreed a gift to defendant to be held by
> him as a charitable trust.

8. SAME—CONSTRUCTIVE TRUSTS—FRAUD.

> Constructive trusts do not arise by agreement or from intention,
> but by operation of law; and fraud, active or constructive, is
> their essential element.

9. SAME—EX MALEFICIO—EQUITY.

> Trusts *ex maleficio* or *ex delicto* are raised by courts of equity
> whenever it becomes necessary to prevent failure of justice.

10. SAME—CONSTRUCTIVE TRUST—CLINIC—EVIDENCE.

> One to whom funds were given to establish a clinic *held*, not
> shown by record, in suit by physicians, surgeons and dentists
> for determination of property rights, to have made statements
> or conducted himself with relation to clinic so as to create a
> constructive trust inuring to benefit of plaintiffs.

11. PHYSICIANS AND SURGEONS — GROUP PRACTICE — CLINIC — JOINT
ENTERPRISE.

> Legal status of physicians, surgeons and dentists engaged in
> group practice in clinic under a constitution whereby office
> was to collect charges made by members and keep record
> thereof, each member was entitled to moneys collected from
> his patients less *pro rata* share of society's general expenses
> and departmental operating expense and no member was to
> share in earnings of any other member *held*, a joint enterprise,
> the association having been formed for business purposes.

12. ACCOUNTING—JOINT ENTERPRISE—CLINIC—PHYSICIANS AND SUR-
GEONS.

> In suit between physicians and surgeons and dentists, engaged in
> group practice in a clinic building which had been given one
> of the defendants, for a determination of property rights, dis-
> covery and accounting, where ''constitution'' under which the

members functioned provided that all charges were to be collected by the office for the member, office should keep complete record of all accounts, member would receive money collected from his patients less *pro rata* general and departmental operating expenses and was not to share in earnings of any other member, and for member's right to receive that to which he is entitled upon withdrawal, plaintiffs *held*, entitled to accounting from defendants as to collections made on new and old accounts, expenses of operation and sums retained by defendants from collections made.

Appeal from Wayne; Richter (Theodore J.), J. Submitted June 24, 1937. (Docket No. 133, Calendar No. 39,610.) Decided November 10, 1937.

Bill by Herman D. Scarney and others against Norman E. Clarke, Polyclinic Building Corporation, a Michigan corporation, and others for the determination of property rights, an accounting and other relief. Bill dismissed. Plaintiffs appeal. Affirmed in part and reversed in part and remanded for an accounting.

*George E. Brand,* for plaintiffs.

*Monaghan, Crowley, Clark & Kellogg* and *Colby, Berns & Costello,* for defendants.

SHARPE, J. This is an appeal from a decree dismissing plaintiffs' bill of complaint seeking determination of property rights and an accounting involving a medical-dental clinic. The plaintiffs are 9 of the 12 clinic members and the defendants are the remaining 3 members, the wife of one, and a corporation which formerly held title to the land and certain of the equipment used by the clinic. The central figure involved in this cause is Dr. Norman E. Clarke, a graduate of the medical school of the

University of Michigan in the year 1921.  Dr. Clarke later came to Detroit as associate chief of cardiorespiratory diseases at the Henry Ford hospital where he remained for about two years when he entered private practice with offices in the General Motors building.  He early came to realize the value of group practice and had become acquainted with the larger clinics of the country.  In 1926, he became acquainted with Dr. Lemley and in 1930 with Dr. Croushore.  In the early part of the year 1930, the medical profession together with other professions and businesses began to feel the effect of the depression; and people with limited incomes began to avail themselves of free clinics owing to their inability to pay the regular prices for medical services. As a result of this condition doctors gathered together in groups to discuss the conditions that were affecting their financial returns.  One of these groups consisted of Doctors Clarke, Stiefel, Hershey, Lemley, Jarre, Croll, Bernbaum, Daniels, Croushore, MacKenzie, Steinbach, Insley, Fox, Hudson, Sandweiss, Kelly, Martin and Raveno.  As a result of these meetings an association, known as the society of physicians, was formed.  The members were interested in a method or plan whereby low income people could be brought into their offices and treated, the payments being made by these people through an insurance fund.  Funds being necessary to carry on the work of the society, nine members of the society, including Dr. Clarke, contributed $100 each, one $35, and three members $10 each.  It was soon found that the above contributions were insufficient to carry on the program inaugurated by the society and as a result Dr. Clarke, in February, 1931, went to Mrs. Grace M. Mercer and secured from her the sum of $5,000.  Mrs. Mercer was familiar with the

aims and ambitions along medical lines possessed by Dr. Clarke. The check was drawn to the ''society of physicians'' and Dr. Clarke opened a bank account in that name, but no one was able to draw upon this fund except Dr. Clarke. Subsequent to this gift, the society lasted only a short time owing to the opposition of other physicians; and as a result, a resolution was passed disbanding the society and each contributor was refunded approximately 85 per cent. of his contribution.

After the dissolution of the society, Dr. Clarke continued his investigation relative to a plan for medical care financed by some kind of insurance, using the same bank account he had opened; but finally decided that the plan was not feasible and abandoned it. In the spring of 1931, Dr. Clarke began thinking about some type of medical organization which would augment the practitioner's income and reduce the cost of medical care. This resolved itself into the idea of group practice in a separate and specially equipped building. He discussed this subject with several doctors including Dr. Croushore and Dr. Daniels. He examined different locations, but finally decided to erect a building on west Grand Boulevard in Detroit.

In August, 1931, Mrs. Mercer gave Dr. Clarke a check for $50,000 and in September another check for $50,000 for the purpose of purchasing a lot and erecting a building to carry on the work of the clinic. Both of these checks were made payable to the society of physicians, Dr. N. E. Clarke, treasurer. In July, 1932, Mrs. Mercer gave Dr. Clarke another check for $20,000 made payable to Dr. Norman E. Clarke (Special).

In July, 1932, a corporation was organized and known as the Polyclinic Building Corporation. The corporation took title to the property. The clinic,

called the Detroit Polyclinic, was opened January 1, 1933, but a constitution and by-laws were not adopted until May 29, 1934. Its purpose was to accomplish an organization for the group practice of medicine, surgery, and dentistry so as to render centralized service at a "gauged" cost which would be attained by decreased overhead cost, pooling of equipment and similar acts of business and professional efficiency. The affairs of the clinic went along smoothly for a while, then differences arose as to the right of the several doctors to have access to the books and records of the corporation. Monthly statements were furnished to each doctor showing the amount of gross business of the clinic as a whole together with a statement of the individual business of each member, but no information was furnished to the individual doctor of the business of any other member of the organization.

In August, 1934, the building corporation shortened its corporate existence to September 1, 1934, and dissolved. It deeded the clinic property, through one Russell, to Clarke and wife. In January, 1936, Clarke and wife gave notice to the clinic members to quit the premises and on the same day plaintiffs began the instant suit. The trial court dismissed plaintiffs' bill of complaint and denied an accounting, hence the present appeal.

It is the claim of plaintiffs:

1. That the Mercer gift was not intended for Clarke's personal and individual benefit, but for a charitable or benevolent use;

2. That from the outset the parties were in a fiduciary joint enterprise relationship and that Clarke was entitled to no greater rights than the others;

3. That plaintiffs are entitled to a decree enforcing and assuring the use and benefit of the prop-

erty for the purposes of the clinic on a nonprofit basis, regardless of the lack of signed writings and whether the gift was to Clarke solely for his private benefit or otherwise, because:

(a) A constructive or implied trust for such purposes arose or should be declared under the circumstances,

(b) Clarke is, and should be, estopped to claim individual and private ownership of the property,

(c) Plaintiffs' performance made the understanding enforceable as a trust or an agreement;

4. That neither the suspension of alienation statute, nor the common-law rule against perpetuities, preclude relief to plaintiffs because:

(a) No defense thereon was pleaded or even suggested during the taking of proofs and Clarke, in any event, is and should be estopped from asserting it,

(b) No suspension of alienation or creation of a perpetuity was, in fact, attempted,

(c) The gift, and the arrangement, involved personalty, notwithstanding subsequent conversion of part thereof into realty. Therefore, neither the statute nor the rule is applicable,

(d) The power of the court to enforce an appropriate constructive trust is not affected, whether it be of personalty or realty,

(e) The gift, whether made by Mrs. Mercer or Clarke, may be sustained under the statute as one to a charitable or benevolent use;

5. That the denial of an accounting as to the internal financial affairs of the clinic, a joint enterprise, is indefensible.

During the trial, Mrs. Mercer testified that she gave the sum of $120,000 to Clarke personally to do with as he pleased and the trial court found as a fact that Mrs. Mercer did not intend to, or, create a charitable trust.

In *Jackson* v. *Phillips,* 14 Allen (96 Mass.), 539, 556, the court said:

"A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burden of government."

In 2 Restatement of the Law of Trusts, p. 1096, § 349, it is said:

"A charitable trust may be created by (a) a declaration by the owner of property that he holds it upon a charitable trust; or (b) a transfer *inter vivos* by the owner of property to another person to hold it upon a charitable trust."

In 65 C. J. p. 231, it is said:

"To constitute an express trust there must be an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created."

See, also, 2 Restatement of Law of Trusts, p. 1099, § 351.

A search of the record fails to disclose any acts or statements upon the part of Mrs. Mercer from which an intent to create a charitable trust can be construed. From Mrs. Mercer's testimony, we are constrained to hold that she intended to and did give to Dr. Clarke the $120,000 as an outright gift to do with as he pleased.

Plaintiffs next contend that even though it is determined that the gift was to Dr. Clarke solely for

his private benefit, yet the plaintiffs are entitled to a decree enforcing the use and benefit of the property for the purposes of the clinic on a nonprofit basis because plaintiffs' performance made the understanding as a trust or an agreement.

In charitable trusts the public is the beneficiary. A distinguishing characteristic of such a trust is that the prospective beneficiary is undetermined and unknown, and while such a trust need not be for the benefit of the entire public, yet it must be public in nature and for unascertained beneficiaries. In the case at bar the record sustains the finding of the trial court that the plaintiffs joined with Clarke in this enterprise not for charitable purposes to give medical aid to the poor and needy or to the public at cost, but for the purpose of increasing their own business at a lower operating cost. Nor do plaintiffs complain of a wrong to the public or of a class, but seek to assert private rights, namely, a perpetual interest for the members of the clinic. Under these circumstances, we do not find that a charitable trust can be construed.

The next question that presents itself is whether or not there were any statements or acts upon the part of Dr. Clarke that would create a constructive trust; and, if so, whether such a trust would inure to the benefit of plaintiffs.

The nature of a constructive trust is well defined in *Weir* v. *Union Trust Co.*, 188 Mich. 452, where we said:

"Constructive trusts arise by operation of law. The following is found in 39 Cyc. p. 169:

" 'Constructive trusts do not arise by agreement or from intention, but by operation of law; and fraud, active or constructive, is their essential element. Actual fraud is not necessary, but such a trust will arise whenever the circumstances under which property was acquired make it inequitable that it should be retained by him who

holds the legal title. Constructive trusts have been said to arise through the application of the doctrine of equitable estoppel, or under the broad doctrine that equity regards and treats as done what in good conscience ought to be done. Such trusts are also known as trusts *ex maleficio* or *ex delicto*, or involuntary trusts, and their forms and varieties are practically without limit, being raised by courts of equity whenever it becomes necessary to prevent a failure of justice.' ''

A search of the record fails to disclose any acts or statements upon the part of Dr. Clarke creating such a trust.

The final question presented for review relates to the refusal of the court below to permit an accounting as to the internal financial affairs of the clinic. Attention is called to section 3 of article 9 of the clinic constitution which provides, that all charges made by the individual doctors are to be collected by the office for the member rendering the service; that the office is to keep a full and complete record of all accounts; that each member shall receive all moneys collected from his patients minus his *pro rata* share of the society's general expenses and maintenance charges and the direct operating expense of his department; and that no member is to share in the earnings of any other member. The constitution adopted also provides the right of each and every member upon withdrawal from the clinic to receive that to which he is entitled. In plaintiffs' bill of complaint the following relief is asked for:

"6. A discovery and accounting from said defendants as to the terms and conditions of said contribution by said benefactor, the use of said contributed funds, the collections made by said clinic office for the clinic members, the expenses of maintaining and operating said clinic and building and of all sums received, retained or used by said defendants and each of them from said collections and from the so-called rentals paid by said clinic."

The audit shows that some members have overdrawn, while others have underdrawn their accounts. The constitution under which the physicians were operating provided that each member was to own his own accounts and no other member was to share therein. The record shows that contrary to the constitution, Dr. Clarke assumed full control of the clinic, records, collections and disbursements, and maintained that plaintiffs had no right to examine the records of collections and apportionment of expenses.

In our opinion the legal status of this association, being formed for business purposes is that of a joint enterprise. The rights which plaintiffs seek to protect and enforce as to their earnings; the collections on old accounts; the relationship of Dr. Clarke in connection with his handling of the financial affairs of the clinic give the chancery court equitable jurisdiction. See *All Saints Polish National Catholic Church* v. *Gerald,* 271 Mich. 187.

Plaintiffs are entitled to an accounting from the defendants as to the collections made by the clinic on new and old accounts, the expenses of maintaining and operating the clinic and building, and of such sums as may have been retained by defendants from collections made.

The decree of the trial court will be set aside and the cause remanded for an accounting in accordance with this opinion. Plaintiffs may recover costs.

FEAD, C. J., and NORTH, WIEST, BUSHNELL, POTTER, and CHANDLER, JJ., concurred with SHARPE, J. BUTZEL, J., concurred in the result.