In re George D. NEWPOWER, Debtor.

**Robert Kitchen, Harriet Kitchen and New Properties, Inc., Appellants,**

v.

**James W. Boyd, Appellee.**

No. 1:98–CV–418.

United States District Court,
W.D. Michigan,
Southern Division.

Jan. 22, 1999.

Jonathan R. Moothart, Bowerman, Droste, Bowden, Haring & Moothart, PC, Traverse City, MI, for Robert Kitchen, Harriet Kitchen, appellant, New Properties, Inc., debtor.

Ronald A. Schuknecht, Lewis & Schuknecht, PC, Traverse City, MI, for James W. Boyd, appellée, George D. Newpower, debtor.

## OPINION

HILLMAN, Senior District Judge.

This is an appeal from the bankruptcy court's partial denial of appellants' motion for lift of the bankruptcy stay or for abandonment. At issue in this matter is the bankruptcy court's determination of what property properly should be included in the bankruptcy estate. Upon review, I am persuaded that the bankruptcy court erred in refusing to lift the stay on $582,463 of property traceable to appellants' assets.

## I. BACKGROUND

The facts of this case are not in material dispute. Debtor George Newpower was a licensed Michigan real estate broker. In early 1996, Newpower entered into an agreement with appellant Robert Kitchen ("Kitchen") under which they formed a corporation named New Properties, Inc. The corporation's purpose was to purchase real property in northern Michigan for subsequent development by the company. Kitchen and Newpower were the sole shareholders and directors of the corporation. Kitchen was named as vice president and secretary. Newpower was president and treasurer.

Because Kitchen resided in Alaska for most of the year, most of the meetings of the shareholders were conducted by telephone. Kitchen and Newpower agreed that Newpower, using his experience as a real estate broker, would identify properties for purchase and development by the corporation. He then would recommend purchase of the properties and, if both shareholders agreed, the properties would be purchased in the name of the corporation, appellant New Properties, Inc., through loans made by the shareholders to the corporation. Each time the shareholders agreed to buy a particular piece of property, and after a price had been negotiated, Newpower and Kitchen were each to transfer 50% of the purchase price to the corporation as a loan. No salaries or wages were paid to the shareholders, although the parties anticipated that at some point in the future, Newpower might be paid a real estate commission on parcels later developed and sold. (Kitchen testimony, Transcript p. 34.)

The first property that the shareholders agreed to purchase was an 80–acre parcel in Garfield Township, in Kalkaska County, Michigan, for which a $400,000 price was set. Upon being told the purchase price, Kitchen and his wife sent a check to Newpower for $200,000. The memo portion of the check stated that the check was for New Properties, Inc., and contained a portion of the legal description of the property to be purchased. (Trans. p. 36.) Unknown to Kitchen, Newpower deposited the check in his personal account. He failed to make the property purchase, instead using the $200,000 for his personal use.

Thereafter, for the remainder of 1996, Kitchen and Newpower conducted regular telephone meetings regarding the Kalkaska property, as well as four other parcels. Each time a closing was to occur, Newpower would tell Kitchen how much money was needed to be paid into the corporation to make the purchase. After the first transfer of funds, the Kitchens made wire transfers to the corporate account. Each wire transfer made by the Kitchens was for the purchase of a specific piece of real property. Newpower was the sole authorized signatory on the corporate account.

At no time were properties purchased by Newpower. Instead, he misappropriated for his own use all of the funds transferred to New Properties. Meanwhile, Newpower continued to report to his co-director, Kitchen, regarding the alleged development of the properties. In October 1996, Newpower traveled to Alaska to meet with Kitchen. At that time, he delivered to Kitchen fraudulent "copies" of the deeds to the five properties. Later that month, Newpower telephoned Kitchen and informed him that he had negotiated for $400,000 the purchase of 80 acres in East Mancelona Township on Sand Lake. On October 24, 1996, the Kitchens made two more wire transfers totaling $200,000.

In December 1996, the Kitchens returned to Michigan to check on the status of the properties. Their investigation disclosed that no properties had been purchased as they had been led to believe and that all of the deeds provided to them were forgeries. Following their complaint to the Michigan Attorney General's office, a Michigan State Police investigation was commenced. After being contacted by the police, Newpower fled.

The Kitchens investigated and learned from various checking account and other financial records that, among other things, Newpower had purchased a Corvette, a four-wheel drive pickup truck, and a Larson powerboat; that a new house was built for Newpower's girlfriend Rita Jacobs; that a $60,000 loan was made by Newpower to his former fiancee, Ryan Dobry; and that New-

power had financed $50,000 on the production of a music CD for another girlfriend, Pamela Cannon. The Kitchens filed suit against the transferees of the funds.

Later in the summer of 1997, Newpower turned himself in to authorities, pleaded guilty to embezzlement, and was sentenced to six-to-ten years in prison. In addition, he was ordered to pay $755,000 in restitution to the Kitchens. When he returned, however, Newpower declared bankruptcy. The Kitchens' lawsuit against the transferees was then stayed by the automatic stay issued by the bankruptcy court on November 7, 1997. The Kitchens and New Properties, Inc. moved to lift the stay or order an abandonment so that they could proceed with their state court action.

In total, during the year preceding the bankruptcy filing, Newpower had only $33,000 in legitimate income. The remaining $754,999.64 of funds used by Newpower in 1996—$495,000 that passed through his personal bank account and the remainder transferred from New Properties directly to third parties—came from the loans made by the Kitchens to New Properties. (Tr. p. 140.)

Following a hearing, the bankruptcy court granted the creditors' motion to stay in part and denied it in part. The bankruptcy court concluded that all witnesses were credible and that no substantial facts were in dispute. The bankruptcy court concluded that those monies which were transferred by Newpower directly from the New Properties account to a third party without passing through Newpower's personal account were not property of the estate and that the Kitchens were entitled to proceed on their actions. The bankruptcy court concluded, however, that monies that passed through Newpower's hands in any way or that were used to purchase assets titled in Newpower's name constituted property of the estate. The bankruptcy court specifically reached the following conclusions about eleven items of property:

1. $200,000 check for Kalkaska property deposited by Newpower into his personal account: Estate property

2. $295,000 transferred from New Properties corporate account to Newpower's personal account: Estate property

3. $30,000 transferred from New Properties corporate account to Lakes of the North: Appellants' property

4. $84,000 transferred from New Properties corporate account to William Kitchen: Appellants' property

5. $35,530.85 cashier's check from New Properties corporate account to purchase land for Rita Jacobs: Appellants' property

6. $60,000 cashier's check from New Properties corporate account to Newpower, signed over to Ryan Dobry to remodel her house: Estate property

7. $24,963 check from New Properties corporate account for Larson power boat in Newpower's name: Estate property

8. $14,780.63 check from New Properties corporate account for building supplies for Rita Jacobs' house: Appellants' property

9. $6,000 check from New Properties corporate account to David Bihlman for interest on $50,000 loan: Appellants' property

10. $2,500 in checks from New Properties corporate account to Newpower himself: Estate property

11. $1,205 check from New Properties corporate account for digging Rita Jacobs' basement: Appellants' property

Taken together, the bankruptcy court's decision lifted the stay on $171,516.48, but declined to lift the stay on the remaining $582,463 of assets traceable to the New Properties' corporate account. Kitchen and New Properties, Inc. now appeal that ruling.

## II. *DISCUSSION*

### A. *Standards of Review*

■ Pursuant to 28 U.S.C. § 158(a), this court has "jurisdiction to hear appeals from the final judgments, orders and decrees of bankruptcy judges entered in cases or proceedings referred to the bankruptcy judges under [28 U.S.C. § 157]." An order lifting a bankruptcy stay is a final decision for purposes of appellate review. *See In re Sun Valley Foods Co.*, 801 F.2d 186, 190 (6th Cir.1986). A denial of a motion for lift of stay is also appealable as a final decision because it amounts to a permanent injunction against the moving creditor. *In re Chateaugay Corp.*, 880 F.2d 1509 (2d Cir.1989).

■ This court reviews factual findings of the bankruptcy court for clear error. Fed. R.Bankr.P. 8013; *In re Baker & Getty Fin. Serv., Inc.*, 106 F.3d 1255, 1259 (6th Cir. 1997). Decisions of law, however, are reviewed *de novo*. *Id.* In the instant case, although the bankruptcy court made findings regarding the existence of an express trust and the existence of an agency relationship, those findings were based upon uncontested facts. Opinion of Bankruptcy Court, p. 5. As a result, the bankruptcy court's conclusions that neither an express trust nor agency relationship existed constitute legal conclusions and are reviewed *de novo*.

### B. *Property of the Estate*

The fundamental underlying principle of bankruptcy law is that of ratable distribution. *In re Omegas Group, Inc.*, 16 F.3d 1443, 1445 (6th Cir.1994). All of the debtor's property is collected and distributed in proportional shares. *Id.* As the bankruptcy court properly recognized, the critical inquiry in the instant case is whether the remaining $582,-463 of assets traceable to the New Properties' monies on which the bankruptcy court continued the stay constitute estate property within the meaning of 11 U.S.C. § 541.

"Property of a debtor's estate includes 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *In re Van Dresser Corp.*, 128 F.3d 945, 947 (6th Cir.1997) (quoting 11 U.S.C. § 541(a)(1)). Section 541(d), however, provides that

[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

"Property interests are created and defined by state law, unless some federal interest requires a different result." *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)

■ The interest of the debtor in property includes causes of action. *Id.* (citing *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir.1988), *cert. denied*, 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989)). The debtor's trustee has the exclusive right to assert claims belonging to the debtor at the time of the bankruptcy filing. *Id.* However, "[i]f . . . a cause of action belongs *solely* to the estate's creditors, then the trustee has no standing to bring the cause of action." *Id.* (emphasis in original). Whether a creditor has the sole right to an action is determined by state law. *Id.* If the debtor could have raised a state claim at the commencement of the bankruptcy case, the claim is the exclusive property of the estate and cannot be asserted by a creditor. *Id.* Where, however, the cause of action neither explicitly nor implicitly alleges harm to the debtor, the cause would not have been asserted at the commencement of the action and is not property of the estate. *Id.*

In addition to property preserved for the benefit of the estate under § 541(a)(1), estate property includes " 'any interest in property . . . ordered transferred to the estate under [the trustee's "strongarm" or "avoiding" powers as provided in] section 510(c) or 551 of this title.' " *See Omegas*, 16 F.3d at 1448 (quoting 11 U.S.C. § 541(a)(4)). The bankruptcy code contains provisions empowering the court or the trustee in bankruptcy to recover property belatedly, unlawfully, or fraudulently transferred by the debtor in an

effort to place it outside the reach of creditors. The strongarm provisions allow "the trustee to 'step into the shoes' of a creditor in order to nullify transfers voidable under state fraudulent conveyance acts for the benefit of all creditors." *NLRB v. Martin Arsham Sewing Co.*, 873 F.2d 884, 887, *modified on reh'g*, 882 F.2d 216 (6th Cir.1989).

Appellants contend that Newpower had neither legal nor equitable interest in the property traceable to funds embezzled from New Properties, Inc. As a result, they assert that Newpower's estate has no interest in the properties traceable to the stolen funds. In support of this contention, appellants raise four central arguments.

First, appellants contend that because all money and property at issue was traceable to money stolen from New Properties, title to the property did not vest in appellants and may not properly be considered to be property of the estate. Second, appellants contend that the funds loaned by the Kitchens to New Properties were the res of an express trust. Third, appellants contend that the funds loaned by them to New Properties were possessed and used by Newpower solely as an agent for the corporation. Fourth, appellants assert that money acquired by Newpower by virtue of fraud is not property of the estate.

### 1. *Thief takes no title*

Appellants first assert that Newpower never acquired title in the funds at issue, because he stole those funds. In support of this proposition, appellants cite *Morgan v. Hodges*, 89 Mich. 404, 50 N.W. 876 (1891). The bankruptcy court held that *Morgan* was inapplicable because true theft was not involved in the instant case.

In *Morgan*, plaintiff Morgan leased horses, harness and buggy to Seaman for the purpose of driving to Frankfort. Seaman, however, drove to Grand Rapids and sold them to defendant Hodges. By the time Morgan reached Hodges, the horses had been sold to a third party. Hodges offered to return the buggy and harness if Morgan would not pursue his claim for the horses or their value. Morgan took the buggy and

harness, but in contravention of his promise, sued Hodges for the value of the horses. The Michigan Supreme Court held that Morgan was entitled to recover the value of the horses from Hodges. As a thief, the court held, Seaman never took title to the horses from Morgan and therefore could not convey title to Hodges.

The *Morgan* case, while old, appears to remain good law in Michigan. Appellee contends that the language in *Morgan* that a "thief takes no title" is dicta, because the Michigan Supreme Court held only that Morgan was not bound by his prior promise to settle the case. I am persuaded, however, that the Morgan court's conclusion that a thief could take no title was a necessary predicate to its determination that the settlement entered into by Morgan was not binding. Because the conclusion was necessary to the decision, the language constitutes a holding, even if it is not the final holding of the court.

Appellees assert, however, that *Morgan* should carry no weight because it was decided by a three-to-two margin. In support of this proposition, appellee cites *Sommers v. City of Flint*, 355 Mich. 655, 662, 96 N.W.2d 119 (1959), in which the Michigan Supreme Court held that a then-recent four-to-three decision by that court was "too close a margin to carry great weight under the doctrine of *stare decisis.*" The *Sommers* court, having changed in composition from the court that ruled in the prior case, elected to revisit and overturn its earlier decision. From this holding, appellee contends that this court is entitled to disregard a 3–to–2 decision of the state's highest court in determining state law. I disagree. Although the state supreme court, in considering a subsequent case, was entitled to conclude that a prior divided precedent was entitled to lesser weight under the doctrine of *stare decisis,* neither lower state courts nor this court are free to disregard the opinion of that court unless and until it demonstrates a contrary intent. *See Negri v. Slotkin*, 397 Mich. 105, 244 N.W.2d 98 (1976) (holding that 3–2 decisions by the court were binding on lower courts and concluding that "[w]ere we to hold that 3–2 or 2–1 decisions are not binding on

the Court of Appeals and trial courts, the functioning of our court system would be adversely affected.").

In addition, appellee contends that *Morgan* is inapposite to the case at bar which involves the transfer of title of money. Relying on *Owosso Masonic Temple Ass'n v. State Savings Bank*, 273 Mich. 682, 263 N.W. 771 (1935), appellee asserts that title to money transfers at the time possession transfers. *Owosso*, however, did not purport to overturn *Morgan* nor to hold that title to financial instruments always passes with possession. Instead, *Owosso* addressed only whether interest-bearing bank accounts that were intended to be for the benefit of a trust organization were entitled to a preference over other general deposits in a bank. The court ruled that where the parties clearly intended that the deposited funds be mingled with other bank assets (as would be necessary for such deposits to earn interest), the depositor was in a creditor relationship with the bank and was not entitled to preference over other depositors in the bank.

Appellee also cites *In re Whitacre Sunbelt, Inc.*, 211 B.R. 411 (Bankr.N.D.Ga.1997), for the proposition that possession of money vests title thereto in the holder. However, as appellants observe, the court actually held that "a thief can pass good title to stolen money if the transferee takes *in good faith and for value.*" *Id.* at 417 (emphasis added). Even if the bank took in good faith and for value vis-a-vis the corporation, Newpower never acted with good faith or for value. If the court were to accept appellee's blanket assertion that the bank took good title at the time of Newpower's deposit and could therefore transfer good title to Newpower, Newpower could essentially launder funds stolen from a corporate bank account simply by depositing the stolen monies in a personal bank account prior to using them.

Appellee next contends that *Morgan* implicitly was overruled by enactment of the statutory crime of larceny by false pretenses. Specifically, appellee argues that an element of the offense of larceny by false pretenses is the intention to pass and actual passage of title, in reliance upon the fraud of the inducing party. Appellee therefore asserts that because the legislature enacted a theft crime that anticipates actual passage of title, the legislature implicitly overturned *Morgan.*

■ However, as appellants point out, the legislature is not presumed to have overruled established common law principles without having clearly expressed its intent to do so. *See Michigan Nat'l Bank v. City of Auburn Hills*, 193 Mich.App. 109, 112, 483 N.W.2d 436, 438 (1992) ("[I]f the Legislature had intended to make a change that would affect title to property, it is presumed that it would have indicated that intent by appropriate language.") (internal quotations omitted); *Hasty v. Broughton*, 133 Mich.App. 107, 348 N.W.2d 299 (1984) (legislative amendment of common law is not lightly presumed nor will statutes be extended by implication to abrogate established rules of common law); *Miller v. Manistee County Bd. of Road Comm'rs*, 297 Mich. 487, 500–01, 298 N.W. 105, 111 (1941) ("When the legislature intends to change a common-law rule of law, it must do so in terms of certainty and unless its intent to do so clearly appears it will be presumed not to have made a change by enactment of a statute on the same subject."), *overruled in other part, Mead v. State*, 303 Mich. 168, 5 N.W.2d 740 (1942).

Moreover, contrary to appellee's arguments, the facts of this case do not fit the crime of larceny by false pretenses. The corporation never intended to give *title* to Newpower. Instead, Newpower had limited authority to move corporate funds for authorized corporate purposes.

Further, as appellants observe, *Morgan* itself involved circumstances in which the thief had a right to possession of the horses and wagon in order to drive them to Frankfort. The Michigan Supreme Court held that the holder of such a limited possessory interest was nevertheless a thief within the meaning of the transfer of title.

In addition, in *In re Sielaff*, 164 B.R. 560, 567 n. 7 (Bankr.W.D.Mich.1994), the court acknowledged in dicta that mere possession is not sufficient to give rise to a cognizable property interest under § 541(a)(1). The *Sielaff* court distinguished the statutory requirement of a "possessory interest" from

mere possession, concluding that the right to possess, even if it were not accompanied by the right to title, amounts to more than possession. "Thus, a thief, who could have bald possession of property, without any corresponding right to possession, likely would be unable to use § 541 to claim that the stolen property constitutes property of the estate because he lacks a legal or equitable interest." *Id.*

Appellee contends that the nature of the theft involved in this case is embezzlement, and consequently the debtor had more than mere possession. In fact, appellee asserts, debtor had a right to possession in his capacity as officer of the corporation. By the undisputed testimony, however, Newpower never had authority to *personally* possess any of the corporate funds, save, arguably, the initial $200,000 entrusted to him prior to the corporation being started. In fact, Newpower's authority to control was specifically limited through agreement of the corporate directors about how the funds were to be used. At no time did that authority include the right for Newpower to personally possess corporate funds or even to spend corporate funds on transactions other than specific real estate ventures.

*Morgan* in my judgment remains good law in Michigan. That case, however, does not sufficiently distinguish between the various types of property interests at issue here in order to resolve the status of all disputed sums under the bankruptcy code. As the Sixth Circuit stated in *Omegas,*

> As this court previously has noted, "[w]hile the nature and extent of the debtor's interest [in property] are determined by state law, once that determination is made, federal bankruptcy law dictates to what extent that interest is property of the estate."

*Omegas,* 16 F.3d at 1450 (quoting *In re Terwilliger's Catering Plus, Inc.,* 911 F.2d 1168, 1172 (6th Cir.1990) (internal quotations omitted), *cert. denied,* 501 U.S. 1212, 111 S.Ct. 2815, 115 L.Ed.2d 987 (1991)). As the *Omegas* court concluded on the facts of that case, state law may be at odds with the underlying objectives of the bankruptcy statute.

In the instant case, to hold that all of the transactions in this case were on equal footing under the bankruptcy code is inaccurate. The initial transfer of money from the Kitchens was by personal check to Newpower. The corporation apparently was not in existence at the time. As a result, the money was conveyed by Kitchen to Newpower personally and he had a right to possession of that money in his own name. In such circumstances, the Kitchens certainly conveyed a personal *possessory* interest and, unless some other exception such as an express trust or agency relationship exists, the Kitchens may be considered to have had the same sort of expectations and relationship to Newpower's solvency as any other creditor. As appellants themselves note, bankruptcy courts generally have been skeptical about allowing creditors to except property from a bankruptcy estate by claiming that the debtor acquired it by "theft." *See In re Dynamic Technologies Corp.,* 106 B.R. 994, 1005 (Bankr.D.Minn.1989). For example, in *Omegas,* arguably the expectation of appellant Datacomp, Inc. was that monies it conveyed to Omegas Group, Inc. would be used to purchase computers from IBM and that, in accepting the down-payments, Omegas knew it had no present ability to complete the transactions. Similarly here, without more, the Kitchens' expectation with respect to the initial $200,000 was that Newpower would use it for corporate purchase of the specific parcel of property. I am unable to distinguish the circumstances involving the first $200,000 payment in this case from the creditor's interest in the *Omegas* decision. On the basis of the *Omegas* decision, unless I am able to conclude that an express trust existed or that Newpower was solely an agent for the Kitchens, I would conclude that appellants are not entitled to be treated differently than other creditors with respect to the $200,000 conveyed directly to Newpower personally.

The remaining funds, however, are quite distinct. All other monies were paid by Kitchen into the New Properties corporate account. Appellee cites the court to an unpublished Sixth Circuit decision, *Emerson v. Maples (In re Mark Benskin & Co.),* 59 F.3d

170, 1995 WL 381741, *3 Nos. 94–5421, 94–5422, 1995 U.S.App. LEXIS 16053, at 6 (6th Cir. June 26, 1996), from which appellee argues that theft by "fraud" is distinct from theft by other means in all circumstances and that such funds are properly considered part of the bankruptcy estate. In *Benskin*, however, the corporation itself was the debtor. The *Benskin* court held only that certain investors in a Ponzi scheme were not entitled to priority over other investors simply on the basis of how investors thought their money was to be invested. Here, in contrast, Newpower personally is the debtor. He actually stole monies out of the corporate account over which he had authority only to make certain specific transactions in the corporate interest. Even accepting *arguendo* that Newpower had authority to transfer monies for corporate business other than specific real estate transactions (an assumption at odds with the uncontested facts), he had no authority to place money in his personal accounts. Such transfers constituted theft, not mere fraud, even under the definition in *Benskin*:

a "person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains *or exercises* control over the property without the effective consent."

*Id.* at *6 (quoting Tenn. Cod. Ann. § 39–11–106(13) (1991)) (emphasis added). Here, with respect to Newpower's relationship to the *corporation*, he committed theft by exercising control over the corporation's property without the effective consent of the corporation through its board of directors, Newpower and Kitchen, agreeing jointly. Based on the uncontested facts, Newpower exceeded the authorized consent of the directors and shareholders. In contrast to its definition of "theft," the *Benskin* court defined fraud as including "deceit, trickery, misrepresentation, and subterfuge." While fraud may characterize Newpower's relationship to the Kitchens in obtaining their investments in the corporation, that fraud merely placed him in a position where he had greater ability to commit theft—theft from the corporate assets. Any deceit, trickery or misrepresentation with respect to Newpower's relationship to the corporation was not committed to

obtain authority to conduct the transaction—he never received such authority—but instead to cover up his theft.

In fact, the definition of embezzlement under Michigan law, to which Newpower pleaded guilty, requires a conclusion that the offense is theft from a position of trust or agency:

Embezzlement is defined in M.C.L. § 750.174; M.S.A. § 28.271, as *conversion or taking* by an "agent, servant or employee of another, or as the trustee, bailee or custodian of the property of another, or of any partnership, voluntary association, public or private corporation, or of this state, or of any county, city, village, township or school district within this state."

*People v. Henderson*, 408 Mich. 56, 289 N.W.2d 376, 381 n. 24 (1980) (emphasis added) (quoting Mich. Comp. Laws § 750.174 (subsequently amended effective January 1, 1999)). The act is one of theft, made easier by the existence of a trust relationship. The statute requires the existence of an agency or trust relationship, which I will discuss further *infra*. Newpower pleaded guilty to the offense of embezzlement, making it clear that his conduct falls within the statutory prohibition.

I therefore conclude that *Benskin* provides no support for appellee's distinction. Appellee's narrow definition of what constitutes "theft" would transfer to the estate a greater property interest in the stolen funds than that possessed by debtor at the time of filing. Under appellee's theory, a bank officer could steal bank funds, buy property in his own name, then, upon filing for personal bankruptcy, allow the bank's directly traceable funds to be treated as estate property, with the bank waiting in line to recover funds it never authorized the officer to take. The principle is at odds with the clear intent of the bankruptcy code set forth in § 541(d), limiting the property interest of the estate to that of the debtor pre-petition.

■ Appellee asserts, however, that pursuant to *In re Montgomery*, 983 F.2d 1389 (6th Cir.1993), if the debtor was able to exercise sufficient dominion and control over funds in order to purchase assets, the trans-

fers to third parties diminished his bankruptcy estate. As appellants note, however, appellee's position would swallow the rule that the estate takes only such interest in property as held by the debtor. Any thief has dominion and control over the property he steals. Nevertheless, such dominion and control does not convert stolen property into the thief's own property.

Moreover, *Montgomery* itself is a preference case under 11 U.S.C. § 550(a), in which the debtor engaged in a check-kiting scheme. The court concluded that the last transferee bank could not obtain a priority over other banks victimized by the scheme simply by being the last to receive the transferred funds. Contrary to the broad position of appellee in this case, the *Montgomery* court did not hold that all funds that were subject to any control by a debtor constituted property of the estate. In fact, the court specifically discussed the general treatment of traceable, stolen funds, including embezzled funds, noting that

> [p]reservation of the separate identity of the funds would have been of critical importance; as we said in *Barrow*, 878 F.2d at 916, quoting *Morris Plan Industrial Bank of New York v. Schorn*, 135 F.2d 538, 539 (2d Cir.1943), "[It is a] well settled rule that property converted, *embezzled*, or otherwise taken by the bankrupt, or obtained by him by fraud, can be claimed from the bankrupt estate only so long as it can be definitely traced ...."

*Id.* at 1393 (emphasis added). The court further observed that funds obtained by a debtor which were "earmarked" for payment of a particular creditor were not subject to recovery by the estate as a preference; even when "placed in the debtor's possession before payment to the old creditor, they are not within the debtor's 'control.'" *Id.* at 1395. Control, in other words, requires not only the physical means of exercising control, but also the authority to do so.

In the instant case, in light of the relatively small amount of legitimate earnings by Newpower and that fact that Newpower made direct transfers to third parties to purchase assets in his own name, appellants have been able to trace a significant portion

of the embezzled funds. *Montgomery* fails to undermine appellants' claims that the embezzled funds cannot be considered part of the estate. In fact, the distinctions drawn by the case further support appellants' claims.

In conclusion, while nothing about the *Morgan* case alone distinguishes between the corporate thefts and the initial transfer to Newpower, under both *Omegas* and *Benskin*, the analysis of how those funds should be treated is markedly different. I conclude that those cases require that the initial $200,-000 be treated as assets of the estate (in the absence of some other exception), while not so treating the later thefts from the corporate account. Accordingly, I conclude that *Morgan* remains good law, but provides no basis for relief from the automatic stay for the initial $200,000. The remaining funds transferred by Newpower from the corporate account, however, if traceable, are properly considered property of the creditors that should be relieved from the bankruptcy stay.

### 2. *Express Trust*

Appellants next contend that the monies paid by the Kitchens to Newpower, together with the funds loaned to the corporation of which Newpower was director, were the *res* of an express trust. Appellants raise three separate vehicles through which they contend that an express trust was created: (1) by operation of law through Newpower's position as director of New Properties, Inc.; (2) by express agreement between Newpower and the Kitchens and/or the corporation; and (3) by analogy to federal bankruptcy law governing nondischargeability under 11 U.S.C. § 523(a)(4).

#### a. Director and officer as trustee for corporation

In *Omegas*, the Sixth Circuit concluded that a constructive trust is not a true trust, but instead amounts to an equitable remedy impressed by courts for unjust enrichment. *Omegas*, 16 F.3d at 1449, 1451. The *Omegas* court held that a constructive trust which had not been declared by a court prior to the commencement of a bankruptcy action could not except property from the bankruptcy estate under § 541(d). *See id.* The court analyzed the distinction between a construc-

tive trust, which is a judicial remedy, and an express trust, which is a legal relationship that preexisted any malfeasance. *Id.* at 1449.

Appellants contend that as a matter of Michigan law, the officers of a corporation act with an express trust relationship to the corporation. In support of that contention, appellants refer to the following language adopted by several Michigan courts:

The rule is thoroughly embedded in the general jurisprudence of both America and England that the status of [corporate] directors is such that they occupy a fiduciary relation toward the corporation and its shareholders, and are treated by courts of equity as trustees. They are regarded as agents entrusted with the management of the corporation, for the benefit of the stockholders collectively, and as occupying a fiduciary relation in the sense that the relation is one of trust; and are held to the utmost good faith in their dealings with the corporation.

*L.A. Young Spring & Wire Corp. v. Falls,* 307 Mich. 69, 11 N.W.2d 329, 341 (1943) (adopting Thompson, *Corporations,* § 1320); *Thomas v. Satfield Co.,* 363 Mich. 111, 108 N.W.2d 907 (1961). *See also Thompson v. Walker,* 253 Mich. 126, 134–35, 234 N.W. 144 (1931) ("The officers and directors of a corporation have its affairs committed to their charge upon the trust and confidence they will be cared for and managed, within the limits of the powers conferred by law upon the corporation, for the common benefit of all the stockholders.... It is especially true where one man or family controls and dominates a corporation, that he, or they, must act in the utmost good faith in the control and management of the corporation as to minority stockholders.")

Appellee, however, asserts that the cited quotations were mere dicta and that the corporations statute itself imposes no trust relationship. He further contends, as the bankruptcy court held, that the existence of a provision of the corporations act addressing dissolutions implicitly suggests that officers and directors do not operate in a trust relationship to a corporation. *See* Decision of Bankruptcy Court, p. 27. Specifically, appel-

lee and the bankruptcy judge rely upon a provision addressing the liability of directors after dissolution:

The directors of the corporation are not deemed to be trustees of its assets and shall be held to no greater standard of conduct than that prescribed by section 541.

Mich. Comp. Laws § 450.1834(a). The court and appellee reason that inasmuch as the provision states that the applicable standard on dissolution is not one of trustee and that the standard is the same as that prescribed for all other purposes of the act, no trust relationship can be found in the day-to-day conduct of the business of directors.

■ Although the statutory language may suggest that no precise trust relationship is created by the statute *vis-a-vis individual shareholders,* it is beyond dispute that Michigan common law establishes a fiduciary relationship between directors and officers and the corporation. Liability for corporate actions, however, is modified by the "business judgment rule," *see Thomas,* 363 Mich. 111, 108 N.W.2d 907 (1961), allowing directors the discretion to act in the manner they reasonably consider to be in the best interests of the corporation without imposing a trust relationship with individual shareholders or creditors. Undoubtedly, for this reason, the statutory language disavows the term "trustee," while nevertheless imposing duties of good faith upon the officers and directors.

■ Nevertheless, Newpower's fiduciary relationship *to the corporation* pre-existed Newpower's bankruptcy filing. It pre-existed his wrongful acts. It legally barred him from converting corporate assets into personal assets. *See Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934) ("It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto."). As a result, it is not the equivalent of the legal fiction described in *Omegas:* a constructive trust declared by a court in order to provide

a remedy for unjust enrichment. *See In re Touchstone,* 153 B.R. 955, 956–57 (Bankr. S.D.Fla.1993) (distinguishing *technical* trust created by operation of statute or common law from *constructive* trust). *See also In re Baskett,* 219 B.R. 754, 762 (6th Cir. BAP 1998) (finding express trust despite the absence of formal trust agreement and limiting *Omegas* to situations in which no formal or informal pre-petition trust arrangement exists).

I am persuaded that Michigan case law firmly establishes a cognizable fiduciary obligation owed by the officers and directors of a corporation to the corporation itself. I am further persuaded that the legally recognized fiduciary relationship with respect to the corporate assets, in the circumstances of this case, amounts to a trust for purposes of § 541(d) that is outside the limitations of *Omegas. See Touchstone,* 153 B.R. at 956–57 (stating that it is trust relationship which gives rise to fiduciary obligation). As described in the Restatement (Second) of Trusts, an express trust is a:

> fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of any other person, which arises as a result of a manifestation of an intention to create.

Restatement (2d) of Trusts § 2 (1959). Here, a fiduciary relationship is created by common law at the time a corporation is formed, under which directors and officers are "held to equitable duties to deal with the property for the benefit of [the corporation]." *Id. See also Pittiglio v. Michigan Nat. Corp.,* 906 F.Supp. 1145 (E.D.Mich.1995) (under Michigan law, corporate officers and directors owe fiduciary duty of care and loyalty to corporation and to its shareholders); *In re Rospatch Securities Litig.,* 760 F.Supp. 1239, 1259 (W.D.Mich.1991) (in Michigan, member of board of directors owed common law fiduciary duty to corporate shareholders) (citing *Gaff v. FDIC,* 828 F.2d 1145, 1151 (6th Cir. 1987) (interpreting Michigan law)). Inasmuch as the parties intended such a relationship by forming the corporation, a trust must be considered to arise as a matter of law,

even if limitations on liability of directors would prevent the corporations statute from describing the responsibilities of directors to individual shareholders at dissolution as those of a trustee. *Cf. Touchstone,* 153 B.R. at 956 (fiduciary obligation of corporate officer to corporation, arising as matter of law, creates nondischargeable debt under § 523(a)(4)). *See also In re Interstate Agency, Inc.,* 760 F.2d 121, 125 (6th Cir.1985) (holding that under Michigan law, fiduciary relationship as both insurance agent and as corporate officer establishes an express trust for purposes of § 523(a)(4)).

The case is distinguishable from *In re Garver,* 116 F.3d 176 (6th Cir.1997), in which the court held, in the context of a nondischargeability case where no actual fraud occurred, that a lawyer's general fiduciary duties to treat a client with utmost fairness could not constitute defalcation within the meaning of § 523(a)(4). The court adopted a narrow reading of fiduciary relationship, which it held encompassed only those situations such as embezzlement, in which the debtor holds "funds in trust for a third party." The *Garver* court also specifically recognized not only express trusts, but technical trusts (defined as trusts arising under statute or common law).

In the instant case, Newpower's duties as fiduciary fall within the narrow definition of *Garver:* a violation of a fiduciary duty to hold funds in trust for the benefit of the corporation and constituting embezzlement. Accordingly, by analogy to *Garver,* a qualifying fiduciary relationship is established.

For all of these reasons, I conclude that a cognizable trust relationship between directors and officers of a corporation and the corporation arises by operation of law in Michigan. Accordingly, personal, unauthorized transfers made by Newpower from the corporate account to his personal account or to a third party for title in his individual name may not properly be considered property of his personal estate.

### b. Express trust based on specific purpose of transfers

Appellants also argue that, as a factual matter, both the Kitchens, individually, and New Properties, Inc., were in an express

trust relationship with Newpower, such that the monies were to be used solely for individual, specific property transactions previously agreed upon between the parties.

■ Under Michigan law, "[t]o constitute an express trust there must be an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created." *Scarney v. Clarke*, 282 Mich. 56, 63, 275 N.W. 765 (1937). The creation of a trust does not require the use of particular words. *See O'Neil v. Greenwood*, 106 Mich. 572, 579, 64 N.W. 511 (1895). Its existence may be proved by parol evidence. *Boyer v. Backus*, 282 Mich. 593, 617, 276 N.W. 564 (1937).

In *In Matter of Pauley*, 205 B.R. 501, 513 (Bankr.W.D.Mich.1997), relying upon federal bankruptcy law in determining nondischargeability, the court held that to determine the existence of an express trust, the court must find three elements: (1) the existence of a clearly defined *res;* (2) an unambiguous trust relationship; and (3) specific affirmative duties undertaken by the trustee.[1]

■ Appellants assert that the *res* was clearly defined in each transaction. Following discussions between the shareholders and directors, a specific parcel of property was identified and a purchase price was negotiated. The loans necessary to fund the purchase of the particular property were then forwarded to the corporation.

The bankruptcy court, however, concluded that no express trust existed in this case because the Kitchens loaned their funds to the corporation, and therefore were in a debtor/creditor relationship with the corporation, a relationship which precluded the existence of an express trust. The court further concluded that because the funds had been transferred to the corporation, the trust agreement would have had to have been entered into by the corporation, through its board of directors, to use the funds in trust for the Kitchens. The court reasoned that Mr. Kitchen's subjective understanding as a shareholder as to how the money was to be used was irrelevant. Finally, the bankruptcy judge relied upon the fact that corporate documents and bank account forms did not expressly limit Newpower's authority to spend corporate funds for other purposes.

With respect to the Kitchens, I conclude, as did the bankruptcy court, that with the exception of the initial $200,000, all funds were loaned directly to the corporation, and that because the Kitchens were in a creditor/debtor relationship with the corporation, no express trust relationship can be said to have existed between the Kitchens and Newpower.

■ With respect to the initial $200,000, however, a question remains whether an express trust was formed between the Kitchens and Newpower. The bankruptcy judge did not separately analyze this portion of the Kitchens' money transfers, concluding that the all monies paid by the Kitchens were intended to be loans to the corporation, even the initial payment, and that therefore no express trust relationship existed between the Kitchens and Newpower because at all times the Kitchens were mere creditors of the corporation.

As the bankruptcy court found, however, the initial $200,000 payment to Newpower was delivered to him personally, in his own name, because the corporation was not yet finalized. Inasmuch as Newpower did not transfer the funds from corporate assets, but received them directly from the Kitchens, his position with respect to those funds was somewhat different than those wrongfully transferred from the corporate account, as I previously have discussed.

The undisputed facts show that Kitchen and Newpower agreed to form a corporation to purchase and develop property in northern Michigan and did so. Kitchen made the first loan to the corporation for purchase of the property before the corporation was in existence. The bankruptcy court found that the parties expressly intended that the sum was

---

1. Appellants dispute the applicability of the *Kinsler* definition, to the extent that it is different from the previously cited Michigan standard. Because I conclude that under either definition, appellants have demonstrated the existence of express trusts, I need not decide whether the *Kinsler* definition is more restrictive.

to be a loan to the corporation. As the court noted, that intent was recorded in subsequent corporate minutes.

These facts, together with Kitchen's uncontradicted testimony that the $200,000 payment paid to Newpower expressly as a loan to the soon-to-exist corporation, provide uncontested evidence that the $200,000 was delivered to Newpower personally for the sole purpose of making a loan to the corporation, which itself was for the limited purpose of purchasing a parcel of property. The *res* therefore was clearly defined. The relationship was unambiguous and undisputed. Newpower's duties could not have been clearer.

Accordingly, no evidence exists to suggest that Newpower received title to or discretionary control over the money; instead, he entered into an express trust with the Kitchens, accepting the money solely on behalf of the corporation. Inasmuch as the bankruptcy judge found that the money was intended by both parties to be a loan to the corporation, the finding requires a concomitant legal conclusion that title to the money never passed to Newpower and that his possession of the funds was strictly as trustee, authorized to complete the loan to the corporation.

As a result, I am persuaded Newpower possessed the initial $200,000 solely as trustee for the Kitchens. The sums, therefore, are not properly considered part of the Newpower's bankruptcy estate.

█ With respect to the remaining funds transferred by the Kitchens to the corporation, I conclude that Newpower acted as express trustee for the corporation. It is axiomatic that a corporation may only act through its directors and officers. *See Gordon Sel–Way, Inc. v. Spence Bros., Inc.*, 177 Mich.App. 116, 440 N.W.2d 907 (Mich.App. 1989) ("A corporation is merely a legal fiction acting through its officers and agents."), *aff'd in relevant part*, 438 Mich. 488, 475 N.W.2d 704 (1991). Where, as here, the directors agreed that each loan from the Kitchens would be taken with the sole purpose of purchasing a particular piece of real estate, the corporation had reached an express understanding as to Newpower's authority and as to how each corporate loan was to be used.

(Tr. p. 48.) The *res*, therefore, was unambiguous in every case. Further, Newpower's duties as corporate signatory were unambiguous—he was to purchase the identified parcel of property. Both Kitchen and Newpower agreed that such purchases were the sole purpose of the loans. (Tr. p. 52; Cr. Ex. D, p. 14.) Based on the undisputed circumstances of this case, I am persuaded that it is beyond doubt that a trust relationship existed between Newpower and the corporation, both by operation of law and by specific agreement of the board of directors.

I note that the bankruptcy judge rejected Kitchen's understanding of how the money was to be used as irrelevant because he was a mere shareholder. Kitchen, however, was one of only two directors. No authorized action could be taken by the corporation except upon decision of the board of directors. What Kitchen testified to was that Newpower and he, as directors of the corporation, agreed on the taking of loans for the express purpose of buying each particular piece of property. (Kitchen testimony, Trans. p. 48.) No contrary evidence was introduced in this case and Kitchen's testimony therefore must be accepted. In fact, the bankruptcy judge found that Kitchen's testimony was credible. Accordingly, had Kitchen, as a mere shareholder, testified only to his personal understanding of how funds were to be used, that understanding might be irrelevant. Here, however, Kitchen's testimony provided uncontested evidence of what the shareholders and directors *had agreed*. Such agreement about the use of the funds and the scope of Newpower's authority supports a finding of a trust relationship.

Finally, although the articles of incorporation would have allowed the corporation to have additional purposes and did not themselves restrict the uses for the wire-transferred sums, no written limitations are required under Michigan law to find the existence of a trust.

I therefore conclude that the monies that were wire-transferred to the corporation and that Newpower later transferred to his personal accounts or to third parties for obtain-

ing property titled in his individual name were the *res* of express trusts and may not properly be considered property of the estate. Taken together, I conclude that all of the funds at issue on this appeal were the subject of an express trust and that the bankruptcy court erred in concluding that $582,463 constituted assets of the estate.[2]

### 3. *Agency*

▇▇▇ Even were I to conclude that no express trust existed, however, I would conclude that Newpower was a mere agent with respect to the funds of the corporation. The bankruptcy court rejected this argument without citation to Michigan agency law. It is axiomatic, however, that because a corporation may only act through its officers and directors, those officers and directors are agents of the corporation. *See Garey v. Kelvinator Corp.*, 279 Mich. 174, 271 N.W. 723 (1937) (directors are agents of corporation).

> [A]n agency is a relationship arising from a contract, express or implied, by which one of the parties confides to the other the transaction or engagement of some business or some other activity in his name, or on his behalf, and whereby the other party assumes so to act and to render an account thereof. Thus in both situations, the title to the property remains in the bailor or principal, and the bailee or the agent holds the property under the bailment or agency for the owner's benefit. Consequently, it became well-settled under the Bankruptcy Act that absent state statutory enactment to the contrary, if property was in a debtor's hands as bailee or agent, the trustee held it as such, and the bailor or principal could recover the property or its proceeds.

*In re Zwagerman*, 115 B.R. 540, 547 (Bankr. W.D.Mich.1990). As I previously noted, "[corporate directors] are regarded as *agents* entrusted with the management of the corporation, for the benefit of the stockholders collectively ...." *L.A. Young Spring & Wire Corp.*, 11 N.W.2d at 341 (adopting Thompson, *Corporations*, § 1320) (emphasis

added); *Thomas*, 363 Mich. 111, 108 N.W.2d 907. Directors hold property only as agents of the corporation. *See In re Zwagerman*, 115 B.R. 540, 547 (Bankr.W.D.Mich.1990). In addition, in entering his plea of guilty to embezzlement, Newpower himself admitted that he was serving as an agent for both Kitchen and New Properties, Inc. (Ex. D: Transcript of plea hearing, pp. 9–10.)

As a result, monies deposited with New Properties, Inc. were at all times held by Newpower only as agent for the corporation. Accordingly, he never acquired any property interest in the money or any property acquired with those funds. *Zwagerman*, 115 B.R. at 557.

▇▇▇ Moreover, with respect to the initial $200,000, I conclude that Newpower was an agent for the Kitchens. As the bankruptcy judge noted, the bank draft specifically referenced the property to be purchased with the funds and noted the new corporation, New Properties, Inc. Kitchen's undisputed testimony, which the bankruptcy judge credited, was that the initial $200,000 was delivered to Newpower solely for purpose of making the initial deposit to the corporation, which was itself intended to be used for the sole purpose of purchasing the initial parcel of property.

Thus, Newpower's possession of the $200,000 was for the sole purpose of completing a loan to the corporation. Newpower's role, therefore, is not the subject of a factual dispute. In addition, his role must legally be described as that of an agent for the Kitchens.

Accordingly, for these reasons as well, I conclude that inasmuch as Newpower served merely as agent for either the Kitchens or the corporation, any funds taken into Newpower's possession while he was acting as agent or converted into assets in his individual name during his agency may not be properly included as assets of the bankruptcy estate. As a result, to the extent they are

---

**2.** Having determined the existence of an express trust both as a matter of Michigan common law and on the undisputed facts, I decline to reach appellants' argument that an express trust may be established by way of analogy to nondis-

chargeability cases under 11 U.S.C. § 523. However, I note that the Sixth Circuit in *Omegas*, 16 F.3d at 1452, carefully distinguished the remedy of nondischargeability from that of exclusion of property from the estate.

traceable, the monies at issue in this appeal cannot be considered property of the estate.

## III. *CONCLUSION*

For the foregoing reasons, I conclude that the bankruptcy court erred in concluding that any funds expended and property purchased by Newpower which are traceable to the embezzled funds of appellants are property of the estate and therefore subject to the automatic stay provided in 11 U.S.C. § 362. Accordingly, I reverse that portion of the bankruptcy court's decision declining to lift the stay with respect to the remaining $582,463 of property traceable to appellants' funds.